IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11598 WGY |
| | ) | THREE-JUDGE COURT |
| CITY OF BOSTON, | ) | |
| MASSACHUSETTS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RESPONSE TO OPPOSITION TO THE UNOPPOSED MOTION TO CLARIFY

This matter arises from the efforts of the original parties to correct a misapprehension on the part of the Secretary of the Commonwealth of Massachusetts ("Secretary"). The Secretary seeks to overturn a carefully crafted resolution addressing serious violations of federal law on the grounds that the federal law remedy is not in concert with the state law that was enacted to effectuate the parties' agreement. The Secretary seeks to impose his own interpretation of state law and the agreement to undo the negotiated remedies that were created to protect the rights of Boston's Chinese American voters.[1]

Poll workers and others purporting to assist Chinese-speaking voters – which voters were unable to read the names of the candidates – actually mis-marked the ballots of Chinese voters and cast the ballots contrary to the voters' wishes, thereby denying the right of such voters to equal access to the franchise as guaranteed by federal law. Accordingly, the Memorandum of Agreement and Settlement ("MOA") specifically required a fully bilingual Chinese ballot.

---

[1] The United States files this Response to the pleadings submitted by the Secretary in his Motion to Intervene, including his attached Opposition to the Unopposed Motion to Clarify. The United States does not object to the Secretary's intervention for the limited purpose he requested.

The Constitution allows a court to order relief necessary and appropriate to cure federal law violations and, where necessary, to supercede conflicting state laws. The MOA specifically offered the state an opportunity to enact any legislation necessary to conform to the MOA as a means of avoiding the necessity for such court action. The state duly enacted legislation to conform to the MOA. The Secretary, who was not a party to the MOA, seeks to interpret this statute and the MOA in a way that defeats the agreed-upon relief. The United States' Unopposed Motion to Clarify represents the least intrusive measure to resolve the Secretary's misapprehension that a bilingual ballot should not be fully bilingual as to the essence of the ballot, the names of the candidates. To avoid the necessity for further litigation, the United States respectfully requests that the Court grant the Motion so that candidates' names can be read and understood by all voters.

## PROCEDURAL HISTORY

The United States filed suit on July 29, 2005 against the City of Boston, the Mayor of the City of Boston, the Boston City Council, the Boston Election Department, and the Chair of the Boston Election Department ("City of Boston"), raising, *inter alia,* a claim under Section 2 of the Voting rights Act, 42 U.S.C 1973, the general prohibition against voting practices that result in discrimination, that Chinese American citizens had suffered discrimination in the form of the "improper[] influencing, coercing or ignoring [of their] ballot choices," specifically, that the Chinese-speaking voters who could not read English had their ballots marked contrary to or without their consent. Docket #1. The parties entered into negotiations to resolve the dispute and, on September 15, 2005, submitted to the Court the MOA. Docket # 22. Among other provisions, the MOA provided for bilingual election materials, including ballots, and information

in Chinese so that Chinese-speaking citizens who are limited-English proficient ("LEP"), would be able to participate in voting on an equal basis with other citizens. Id. The Court held a hearing on October 17, 2005 and modified Paragraphs 22-25 of the MOA. Docket #60. The Court approved the modified MOA and retained jurisdiction through the expiration of the MOA. Id. The MOA mandated fully bilingual Chinese ballots.

Paragraph 2 required the City to petition the state legislature to enact a Home Rule legislation pursuant to the Home Rule Amendment to the Massachusetts Constitution and the Massachusetts Procedures Act, G.L. c.43B, s.1 et seq. The Legislature duly passed House Bill 4942, Chapter 111 ("Chapter 111") to effectuate the MOA. Decl. of Gerry Cuddyer ("Cuddyer Decl.") at 5, ¶ 15 (attached as "Ex. A"). Section 1 of Chapter 111 mandates that the Secretary "shall prepare bilingual ballots in English and Chinese . . . . in designated polling places within the City of Boston as defined by Paragraphs (9) and (20) of [the MOA]."[2] Chapter 111 provides no exception or qualification for candidate names.

The Secretary subsequently declined to transliterate candidates' names, although he did transliterate other ballot terms. See Cuddyer Decl. at 6, ¶ 18; Decl. of Lydia Lowe ("Lowe Decl.") at 3, ¶ 13 (attached as "Ex. B"). On May 24, 2007, the United States filed the instant Motion to make clear the parties' original intent that the MOA include transliteration of candidates' names. Docket # 72. On July 9, 2007, the Secretary filed a Motion to Intervene as a Defendant to "oppos[e] the United States' 'Unopposed Motion to Clarify Memorandum of Agreement and Settlement' . . . and [to] seek[] appropriate declarations concerning the

---

[2] Section 2 of Chapter 111 imposes the same requirements for municipal elections as it does for state and federal elections.

transliteration into Chinese characters of candidate names." Docket #78. The Court granted the

Motion to Intervene on July 19, 2007. Docket #85.

## STATEMENT OF FACTS

**A.     Chinese American Citizens Did not Have Equal Access to the Election Process.**

The United States brought suit on behalf of Chinese American citizens because Chinese-

speaking voters, particularly elderly LEP voters, were coerced and pressured into voting for

certain candidates. Some voters even had their ballots taken from them by poll workers and

marked without their consent or input. Docket #1. For instance, Mr. Tse Ngar Cho experienced

pressure and improper influence while voting at Quincy School while voting in a September

2003 municipal primary election. Decl. of Tse Ngar Cho at 2, ¶ 3 (attached herein as "Ex. C").

A poll worker approached Mr. Cho without invitation and told Mr. Cho to "vote for numbers 6

and 10" and looked over Mr. Cho's shoulder as he voted, violating the secrecy of the ballot. Id.

at ¶¶ 4-5. After Mr. Cho had voted for two candidates, the poll worker told him "[t]hat's good

enough. Voting for these two candidates will do," preventing Mr. Cho from voting for his

preferred candidate. Id. at ¶¶ 5-6. Other Chinese-speaking citizens had similar experiences

while voting. Decl. of Siu Chin Tsang ("Ex. D"); Decl. of Sum Ming Yu ("Ex. E").

Similar instances of coercion and privacy violations were observed by poll watchers from

independent groups. For instance, Karen Chen observed two elderly voters being given

unsolicited instructions by a poll worker to vote for particular candidates: "vote for these two,

these two." Decl. of Karen YuZhen Chen at 2-3, ¶¶ 5-7 ("Ex. F"). This occurred while Ms.

Chen was serving as a "poll checker" at Quincy School for the Chinese Progressive Association

("CPA") in the September 2003 municipal primary election.[3] Id. In November 2004, Ms. Chen, while monitoring at the Franklin Institute polling place, observed a poll worker targeting elderly Chinese, asking them in Chinese if they knew who they wanted to vote for. Id. at 4-5, ¶ 12. Ms. Chen observed the poll worker sometimes took the voter's ballot and marked such, without any indication that the poll worker was reviewing the ballot with the voter. Indeed, for some of these voters there was not any interaction at all with the poll worker. Id. at 5, ¶ 13. These voters did not request the poll worker's assistance and did not give the poll worker any indication of their preferred candidate. Id. Such conduct was observed by other independent citizens. Lowe Decl. at 4, ¶ 10.

Chinese-speaking voters experienced other inequalities such as not being able to vote with the certainty and independence of other citizens. In the absence of fully bilingual ballots, these voters tried to use makeshift procedures to vote. For example, Joe Ho Lee tried to memorize the first two letters of the English name he wanted to vote for and then attempted to find those letters on the ballot. Decl. of Joe Ho Lee at 1, ¶¶ 1-5 ("Ex. G"). Despite his best efforts, Mr. Lee believed that he "may have selected the incorrect candidate" when there were several names on the ballot. Id. Another voter, Kwok Yim Chiu, relied on others to tell which number on the ballot corresponded to Chiu's preferred candidate and was afraid of forgetting or miscounting the number. Decl. of Kwok Yim Chiu at 1, ¶¶ 1, 3-4 ("Ex. H"). Another voter, Chor Heung Chou, brought a piece of paper with the candidates' names written in Chinese to vote and asked poll workers to help figure out which on the ballot was Chou's preferred

---

[3] Ms. Chen, as a community organizer for CPA, helped measure the group's progress in registering and turning out voters by checking names as persons came to vote. Id. at 1-3, ¶¶ 2, 5.

candidate.  Decl. of Chor Heung Chou at 1, ¶¶ 1-4 ("Ex. I").  Many other Chinese American voters in Boston experienced similar challenges while voting when the ballot contained the names of the candidates only in English.[4]

As a confirmation of the above problems, the Federal Observer Reports ("FOR") filed with the Court for the September 19 and November 7, 2006 elections illustrate the inequalities that Chinese-speaking LEP voters experienced because the candidates' names were not transliterated into Chinese.   See FOR Franklin Institute at 27B (Cantonese-speaking voter brought in name of candidate written in Chinese, attempted to read the name out loud as "Paidi" to the interpreter, who found the name for the voter on the ballot), 27J (voter told interpreter that she wanted to vote for the "3rd name on this paper," and interpreter initially could not find the name on the ballot), 27M (interpreter had to help voter match up the names from the sample ballot to transfer the marks to the ballot, and the voter "seemed to have trouble lining up the two pieces" of paper), 27K, 27O, 27R, 27QQ, 27PP, 27FF, 27L, 27UU, 27RR, 27X, 27CC, 27D, 27JJ, dated September 19, 2007 (attached to Docket #64 as attachment 1); FOR, Franklin Institute at 27D, 27E, dated November 7, 2006 (attached to Docket #65 as attachment #19 and #20).  FOR, Metropolitan at 22G, 27D (attached to Docket #65 as attachment #27 and #28), dated November 7, 2006.  Many of the voters were transferring marks from an unofficial "sample ballot."  FOR, Franklin Institute at 27N, 27II, 27SS, dated September 19, 2007.

---

[4] See Decls. of Henry Yee, Hoen Gin Ng, Fat Ng, Bark Jew Huey, Lai Hung Yong, Xie Chu, Sou Pong Lo, Jian Hua Tang, Qui Qing Yu, Lin Kay Ching, Yim Chui Hui, Kit Wan Ho, Fook Pui Chan, Rui Qin Chen, Kwok Cheuk, Jin Ying Wong-Kwong, Siu Ching Tsang, and Sum Ming Yu.  ("Exs. J-Y, C-D").

**B.      The MOA has Proven Effective.**

Pursuant to the MOA, the City hired Helen Wong as its Elections Language Coordinator on March 20, 2006, and she promptly began work on translation of election related materials, including researching how other jurisdictions transliterated the names of candidates.  See Decl. of Helen Wong ("H. Wong Decl.") at 1-2, ¶ 4-6 (attached to Docket #82 as Ex. 3; Cuddyer Decl. at 4, ¶ 11.  After gathering information on the practices of other jurisdictions, Helen Wong focused on San Francisco's procedures as a model for Boston's current transliteration procedures.  H. Wong Decl. at ¶ 6.  On June 30, 2006 she presented the information concerning San Francisco's program, including its transliteration of candidates' names, to the Secretary's Election Department.  Id. at 2, ¶ 8.

The City did not transliterate the ballot for the special elections related to the City Council seat in District 1 in the spring of 2006.  Cuddyer Decl. at 6, ¶ 17.  At that time, the City was in the initial stages of developing a process for transliteration and did not want to act without an adequate procedure in place.  Id.  Also, the precincts involved in those elections had a small number of Chinese-speaking voters.  Id.  The second page of each FOR for these elections confirms that no Chinese-speaking voters received language assistance in May 2006, and that only three Chinese-speaking voters received assistance in June 2006.  See Docket #63 and attached FOR.

The City transliterated the names of the candidates into Chinese for the April 17, 2007 and May 15 2007 special municipal elections for District 2 City Council seat, which represents the Chinatown precincts.  Cuddyer Decl. at 2, ¶ 3.  Because the City transliterated the candidates' names on the ballot, Chinese speaking voters were able to understand and recognize

candidates' names on the ballot and make sure they were voting for their preferred candidate. <u>See</u> Decl. of Tse Ngar Cho at 1, ¶ 3; Decl. of Kwok Yim Chiu at 1-2, ¶¶, Decl. of Chor Heung Chou at 2, ¶ 5; Decl. of Joe Ho Lee at 1-2, ¶ 6. For instance, Hoen Gin Ng was able to vote without any assistance for the first time in his life. <u>See</u> Decl. of Hoen Gin Ng at 1, ¶ 6. Also, several voters noted how much easier they found it to vote.[5]

**C.    Transliteration is Common, Widespread, and Effective.**

In its enforcement of the Voting Rights Act, the United States has long required the transliteration of candidates' names in circumstances such as in Boston: "a candidates' name is one of the most important items of information," on a ballot. Letter from Assistant Attorney General for Civil Rights Deval L. Patrick, May 13, 1994 (Docket #82 as attachment #1).[6]

Western names have been transliterated into Chinese for hundreds of years. Decl. of Dr. Tobie Meyer-Fong at 1-3, ¶¶ 2-5 ("Ex. AE"). For example, names in the Bible have been transliterated into Chinese – Jesus as "revive" "rest" or "collect;" Mary as "agate, carnelian" and "interest on a bank account;" Joseph as "if" and "a kind of a musical instrument" or "chilly." Decl. of Mee Chan at 1, ¶ 3 (attached as "Ex. AF"). Although these may seem odd to the uninitiated, Chinese speakers reading those characters recognize them reverently as the persons in Scripture and not as nonsensical meanings. <u>Id.</u> at 4, ¶ 1-2. Transliterated names in the Bible

---

[5] <u>See</u> Decls. of Li Zhen He, Tog Sun Kwong, Yick Siu Quan, Kwan Fong Chau Wu, Qui Bo Wu, Siu Ching Tsang, Sum Ming Yu, Henry Yee, Bark Jew Huey, Xie Chu, Jian Hua Tang, Qui Qing Yu, and Yim Chui Hui (attached herein as "Exs. Z, AA-AD, B, C, I, L, N, P, Q, S.")

[6] The Secretary, in his supplemental statement to the Court, contends that the position taken in that letter is somehow inapplicable because this is a Section 2 remedy, and the letter to New York dealt with jurisdictions that were under Sections 5 and 203 requirements. Docket # 83. However, the hardship for voters in reading candidates' names in English does not change under any part of the Voting Rights Act.

are "understood purely as transliteration."  Decl. of Dr. Tobie Meyer-Fong at 1-2, ¶ 2.  In the 16th century, Jesuit Matteo Ricci adopted a name for himself in Chinese with characters "that if translated literally would read 'Plum-Agate-Hole' . . . and it would have been clear to readers that this was a name and not something meant to be understood as individual, meaning-bearing characters."  Id.

People do not stop to think about what the characters used in the transliterated names of Ronald Reagan, Michael Jordan, or William Clinton, mean individually.  Id.  Readers of Chinese, past and present, have become accustomed to encountering strings of Chinese characters that represent foreign names and terms—and they recognize the characters as foreign names.  Id.

Many other major jurisdictions transliterate the names of the candidates on the ballot into Chinese.  See Decl. of John Arntz ("Arntz Decl.") (attached herein as "Ex. AG"); Decl. of Kathay Feng ("Feng Decl.") at 2, ¶¶ 3-4 (attached herein as "Ex. AH"); Letter to Assistant Attorney General for Civil Rights Deval L. Patrick from Ms. Kathy King dated August 29, 1994 (attached to Docket #2 as Ex. 2).  San Francisco, Los Angeles, and Orange Counties have procedures in place to ensure the adequacy of transliteration.  Arntz Decl. at 1, ¶ 2; Feng Decl. at ¶¶ 3-4.  San Francisco has not had a problem avoiding transliterations that contain negative connotations or meanings, and transliteration of candidates' names in San Francisco has not resulted in litigation.  Arntz Decl. at 1-2, ¶¶ 1-3; see also Chan Decl. at 1-2, ¶ 5.  Similarly, Los Angeles transliterates candidate names without problems for either voters or candidates.  Feng

-9-

Decl. at 2, ¶ 5.[7]

Boston employs model procedures.  Its Chinese Language Liaison Ann Wong, with assistance from Ping-Kam Chan, a professional translator with 23 years experience transliterating English names for the Boston Public Schools, provides the initial transliterations. Cuddyer Decl. at 2, ¶ 5; Decl. of Ping-Kam Chan ("Chan Decl.") at 1-2, ¶¶ 4-5 ("Ex. AI"); Decl. of Ann Wong ("A. Wong Decl.") at 3, ¶ 11 ("Ex. AJ").[8]  Bik Fung Ng, Chinese Language City Liaison and member of the City Advisory Board, further reviews the transliterations.  Decl. of Bik Fung Ng at 2, ¶ 5 ("Ex. AK").   Members of the community review these initial transliterations and further refine or confirm the result.  The City then notifies all candidates of the transliterations and asks them to approve the standardized version of their transliterated names.  H. Wong Decl. At 4, ¶ 15

Boston's procedure of standardizing the candidates' names in the press and in election materials allows Chinese speakers, whether Mandarin- or Cantonese-speaking, to read each name and associate it with the corresponding candidate.  Decl. of Dr. Tobie Meyer-Fong at 2 ¶ 5. After the transliterations are finalized, the City sends out a press release to community organizations, campaign offices, and Chinese language media, urging them to use the City's versions of the transliterated names in their articles, voter outreach materials, and campaign literature.  Id.  The press has adopted the City's official transliterations.  A. Wong Decl. at 3, ¶

---

[7] The Secretary notes in his Statement to the Court that Cook County, IL and King County, WA do not transliterate candidates' names.  Docket #81 at 1-2.  Cook County has agreed to transliterate candidate names, and the United States is addressing King County.

[8] The process of transliteration is described fully in the attached Decl. of Ping-Kam Chan.

11.  The City has not received any complaints about the transliteration process or about the Chinese transliterated names.  Id.; see also Cuddyer Decl. at 2, 9, ¶¶ 5, 29.

**D.    The City Informed the Secretary Ballots Should be Transliterated by June 30, 2006.**

After informal discussions, the City met with the Secretary's Election Department and discussed the transliteration issue with the Secretary on June 30, 2006.  See Cuddyer Decl. at 5, ¶ 14; H. Wong Decl. at 2, ¶ 8.  On August 7, 2006 the City contacted the Secretary's Election Department by email and offered to do all of the work necessary to transliterate the names for the then upcoming September and November state-run elections.  Cuddyer Decl. at 6, ¶ 18 and email attached to Cuddyer Decl. as "C."  The Election Department declined, noting that based "upon the translations already done in Spanish, in which we do not translate the names of the candidates (sic), it was my recommendation not to transliterate."  Id.[9]

**E.    Chinese Language Audio Ballots Have Not Been Available**

Pursuant to Section 301(a)(3) of HAVA, Massachusetts was required to have at least one accessible voting machines (with audio ballots) available in each polling place in the Commonwealth as of January 1, 2006.  Massachusetts has not met this requirement, as such machines were not available in all Massachusetts precincts during the 2006 federal elections.  See Letters between Secretary and United States ("Exs. AL-AN").  The Secretary informed the

_____

[9] Although the Secretary suggests that he first received notice concerning transliteration from the United States on May 21, 2007, when the United States sent the Secretary's Election Department courtesy copies of letters it had written to the City on the subject on March 30, 2007 and April 26, 2007, see Docket #79 at 8, in fact, the City had already, on April 4, 2007, met with the Secretary's Election Department and showed the March 30, 2007 letter to the Secretary.  Cuddyer Decl. at 6-7, ¶¶ 19-20.

City on October 13, 2006, and, on October 17, 2006, that new HAVA-compliant AutoMARK machines would be used in the November 2006 election 17, and the City noted that the AutoMARK machines should have audio ballots in Chinese and Vietnamese in order to be accessible to such voters.  Cuddyer Decl. at ¶¶ 22-24.  On October 23, 2006, the City told the Secretary that the AutoMARK machines would need to have Cantonese audio translations.  Id. at ¶ 22.  The Election Department responded that it planned to record the audio in Mandarin only.  Id.  The City explained the dialect differences in Chinese, and the City was then asked for written confirmation that Cantonese was the prevalent dialect in Boston.  H. Wong Decl. at 2-3, ¶¶ 9-10.[10]  On November 3, 2006 the Secretary informed the City that the AutoMARK machines would not have Vietnamese or Cantonese audio capability.  Id. at 16-17, ¶ 24.

Provided so late, many of the AutoMARK machines did not work on election day and would not mark the ballots properly.  Id. at 17-18, ¶ 26.  FORs reflect that machines broke down and voters had problems due to the ineffective machines.  In the Jamaica Plain polling place, two visually impaired voters had to be given a magnifying glass to enlarge the print of the ballot.  See FOR, Jamaica Plain, at 22B, dated November 7, 2006 (attached to Docket #65 as attachment #22).  An accessible machine at the Condon School broke down while a disabled voter was trying to use it and another machine broke down at the Patrick O'Hearn School.  See FORs, Condon School at 22A, Patrick O'Hearn at 22B (attached to Docket # 65 as Attachments #11 and #30).  At Myles-Standish, a blind voter, after being unable to vote privately, stated: "I am mad because I am blind and I feel that should be able to vote in private.  Why don't they have a

---

[10] The audio in Cantonese would not be intelligible to a Mandarin speaker.  Decl. of Dr. Tobie Meyer-Fong at 2-3, ¶ 5; Decl. of Bik Fung Ng at 2-3, ¶ 6.

machine for the blind?"  FOR, Myles Standish at 22B, dated November 7, 2006 (attached to

Docket # 65 as Attachment 6).[11]

## <u>LEGAL STANDARD</u>

## <u>SECTION 2 AND RELIEF UNDER THE VOTING RIGHTS ACT</u>

Section 2(a) of the Voting Rights Act prohibits any state or political subdivision from

imposing or applying "any qualification or prerequisite" to voting or "any standard, practice, or

procedure" which "results in a denial or abridgement of the right of any citizen of the United

States to vote on account of race or color" or membership in a language minority group.  42

U.S.C. § 1973(b).  A Section 2 claim may be made, independent of Section 203 coverage.

<u>United States v. Berks County</u>, 277 F. Supp. 2d 570, 580-581 (E.D. Pa. 2003); <u>Hernandez v.

Woodard</u>, 714 F. Supp 963, 967-969 (N.D. Ill. 1989).

"When a state exercises power wholly within the domain of state interest, it is insulated

from federal judicial review.  But such insulation is not carried over when a state power is used

as an instrument for circumventing a federally protected right."  <u>S.C. v. Katzenbach</u>, 383 U.S.

301, 325 (U.S. 1966).  Courts have "not merely the power but the duty to render a decree which

will so far as possible eliminate the discriminatory effects of the past as well as bar like

discrimination in the future."  <u>Louisiana v. United States</u>, 380 U.S. 145, 154 (1965).  A Court

may fashion relief under Section 2 of the Voting Rights Act necessary to remedy a Section 2

violation.  <u>See</u> <u>Cottier v. City of Martin</u>, 475 F. Supp. 2d 932, 936-39 (D. S.D. 2007) (adopting a

---

[11] The Secretary has not done outreach or training in the community concerning the use of the AutoMARK machines, voters are not familiar with the machines, and the Chinese characters in the April and May 2007 elections were not correct.  <u>See</u> A. Wong Decl. at 3, ¶¶ 12-13.

remedial plan instituting a form of government not allowed by state law because none of the forms of municipal government permitted by state law would remedy the Section 2 violation); <u>cf.</u> <u>United States v. Louisiana</u>, 225 F. Supp. 353, 396 (E.D. La. 1963)(1963)("Thus, in addition to the specific remedy provided in the Civil Rights Act, courts retain an undiminished authority to grant suitable equitable relief that will both rectify past inequities now, without delay, and will prevent future inequities").

## ANALYSIS

**I.    Transliteration is a Necessary and Appropriate Remedy.**

The original complaint in the instant action included serious violations of the Voting Rights Act involving Chinese-speaking, particularly elderly, LEP voters.  These violations were directly related to the Chinese American voters' inability to read the candidate names independently: Chinese-speaking voters were coerced and pressured into voting for certain candidates, some even had their ballots taken from them and marked without  their consent. Chinese-speaking voters were not able to vote independently and privately, but were forced to rely on uncertain and unreliable methods to match candidates' names, and many while fearful that they may have been voting for the wrong person.  Thus, LEP Chinese-speaking voters in Boston did not have equal access to the election process, in violation of Section 2.  The parties' decision to adopt a bilingual ballot, with transliteration of candidates' names, is a necessary and appropriate remedy.

Boston has implemented model transliteration procedures.  The City has created a thorough, deliberate process of transliteration by experts, with community and candidate

feedback.  The transliteration of the candidates' names is followed by standardization with the Chinese American media, community organizations, and campaign offices.  The very voters in the predominantly Chinese precincts who were harmed by the absence of transliterated candidate names have come to rely on the effective process that the City has instituted pursuant to the MOA.  To undo the current election procedures and return to ballots with indecipherable candidates names would disrupt the election process for these voters and cause great confusion.  See Purcell v. Gonzalez, 127 S.Ct. 5, 7 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase").

The experiences of other jurisdictions, especially San Francisco and Los Angeles County, show that fears of problems with transliteration are unfounded.  San Francisco has not experienced any litigation as a result of transliteration and has not had any trouble avoiding negative literal meanings when transliterating.  There have not been problems in Los Angeles for either voters or candidates.  Boston and other jurisdictions have been able to avoid negative connotations in transliterations.  The Secretary fears what might happen, but offers no evidence that any such problems ever actually occurred.  Indeed, such fears reflect a basic misunderstanding of how Chinese-speaking voters perceive transliterated names.

The tangible benefit that Chinese-speaking voters have received from being able to read the names of candidates far outweighs such unfounded fears.  In the past, Chinese-speaking voters were pressured, their privacy was invaded, and their ballots were taken from them and marked without their consent.  The fully bilingual ballot has allowed many voters to vote independently and without undue coercion, fear, or confusion.  The remedy has proved necessary

and entirely appropriate to protect the voting rights of Chinese-speaking citizens.  See Cottier v.
City of Martin, 475 F. Supp. 2d 932; cf. United States v. Louisiana, 225 F. Supp. 353 (E.D. La.
1963).

**II.    The MOA Mandates a Fully Bilingual Ballot.**

The MOA's remedial provisions, subsequently adopted by the Massachusetts Legislature
under Chapter 111, mandates fully bilingual ballots, including candidate names.  The issue was
specifically discussed by the parties during settlement negotiations and was specifically agreed
upon.  This was consistent with the long standing policy of the United States that a Chinese
bilingual ballot include transliteration of candidates' names in circumstances such as in Boston.
Nothing in the MOA distinguishes the obligation to transliterate.  The terms Transliterate and
Translate are encompassed within the term "bilingual."  The United States and the City have
acted with an understanding that transliterated names were part of a bilingual ballot.[12]  As soon
as an Elections Language Coordinator was hired by the City, as part of the launching of its
multilingual election program contemplated under the MOA, she immediately directed her
efforts to the issue of transliteration.

Although delays in hiring the Elections Language Coordinator slowed the process, so that
fully bilingual ballots were not available in the spring Special Municipal Elections, the United
States was aware of the efforts on the part of the City of Boston and the Mayor to institute a

---

[12] The Secretary intimates that the question of transliteration first arose on or about May
21, 2007.  Docket #79 at 8.  However, the City discussed the need for transliteration with the
Secretary's Director of Elections no later than the June 30, 2006 meeting, and *certainly* by the
time of the August 7, 2006 email sent by Michelle Tassinari declining to transliterate the
candidates' names into Chinese despite the City's offer to provide all of the "legwork."

comprehensive language program.  The United States was also aware of the sincerity and diligence of those efforts and the complexity of creating from scratch a sophisticated Asian language program.  Accordingly, the United States has taken a practical and cooperative approach with the City.  Indeed, these May and June 2006 elections involved relatively few Chinese-speaking voters and little or no need for assistance in Chinese.  The Secretary argues that the fact that the May 16, 2006 Federal Observer Reports do not record the failure to have transliterated ballots shows that the parties did not contemplate transliterating in the MOA.  See Docket #78 Attachment #5 at 3.  However, under the circumstances, transliteration was not the focus of the observers.  More telling are the observer reports from the September and November 2006 elections describing large numbers of Chinese-speaking LEP voters who were observed struggling to find their candidates on the ballot.

## III.    Concern About "Further Issues."

The Secretary argues that further issues that may arise should influence the Court's decision regarding what the parties originally intended in the MOA, but does not show how such future possibilities can affect the original meaning of an agreement reached almost two years ago.  The United States chose to file its Unopposed Motion to Clarify in an effort to avoid the need and expense of litigation over a settled case after it became apparent that the Secretary would not provide transliterated candidate names as mandated under both the MOA and Chapter 111.  In doing so, the United States took the minimally intrusive approach, as it has throughout this case, by moving simply to confirm the intent of the parties rather than resort to a joint petition to this Court.  Any future matters can be addressed in the same spirit.

The United States has requested nothing other than this clarification.  The agreed-upon

relief directly addresses the serious harm raised in the original complaint and fully documented in the investigation of the United States. No objections were raised during the negotiations or, so far as the record establishes, during the consideration of Chapter 111. There is nothing to show that the Legislature had any intention in passing Chapter 111 other than to effectuate fully the remedies provided in the MOA.

The Secretary raises the future concern about the interaction of state law and the remedy provided by this Court. If or when such issues arise, the Court can determine at that point the appropriate remedy under federal law.

**IV.    Alternative's Proposed by the Secretary Are Not Adequate Remedies.**

The Secretary's proposed alternative solutions to address Chinese-speaking voters' inability to understand who they are voting for in English include the following: the use of flyers or pamphlets with candidates' photographs next to the candidates' name in English, increased publicity to the Chinese-speaking community concerning the availability of the AutoMARK machines with touch screen capabilities, and full reliance on the audio ballots. None of these alternatives are viable.

The Secretary has had considerable difficulty in meeting its federal obligation in voting machines to serve the Commonwealth's voters with disabilities. An insufficient number of machines for the November 2006 election were delivered to Boston at the last minute and without Chinese or Vietnamese language capabilities. The Secretary's outreach and training in the community concerning the use of the AutoMARK machines has been non-existent, voters are unfamiliar with the machines, and some of the Chinese characters for the machines in the April

-18-

and May 2007 elections were incorrect.  The audio ballot, moreover, is extraordinarily time-consuming: each office, candidate name, and proposition must be read in full.  This process, that takes seconds for those who can read, can exceed 30-45 minutes.  The tremendous delays created by hundreds of Chinese-speaking LEP voters each listening to the audio version of an entire ballot would create an unmanageable and grossly unequal process for the affected voters.  Mandarin-speaking Chinese voters in Boston who would not be able to understand the Cantonese audio, would be excluded entirely, as would hearing impaired citizens.

The Secretary's suggestion to use photographs of candidates next to candidates' pictures is also inadequate.  The use of photos has the potential to heighten the role of race in elections and lead to candidates' use of racial appeals during the campaign.[13]  See U.S. v. Charleston County, 316 F. Supp. 2d 268, 295 (D. S.C. 2003) (individual instances of racial appeals were found where candidates used opponents' photographs to alert voters of the opponents' race where some African American candidates' photographs were darkened and some African American candidates de-emphasized their race by not utilizing their own photographs at all).  The complexities of choosing neutral photographs, as well as the layout and format issues presented by a picture ballot, dwarf those of adapting effective and well-established transliteration methods, and Chinese voters' rights would retrogress to pre-lawsuit barriers of cross-matching English and Chinese characters on mis-matched documents.  See, e.g.  The Attorney General's Minority Language Guidelines § 55.19 (d) ("Where such sample ballots are used, the Attorney General will consider . . . whether the sample ballots are identical in layout to

---

[13] The use of racial appeals is the sixth senate factor recognized under the totality of the circumstances analysis for a Section 2 violation. S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982).

the machine ballots, and whether their size and typeface are the same as that appearing on the machine ballots."). 28 C.F.R. § 55.19(d) (2007).

The names of candidates are the most important information on a ballot. Especially in a party primary, where the absence of cues such as party affiliation, the absence of candidates' names renders the ballot meaningless. In Boston, primaries are often tantamount to election.

The parties have entered into a thoughtful agreement to address serious violations of federal law directly related to voters' ability to read candidate names independently. The City has adopted model procedures to effect that agreement, and the benefit to voters has been demonstrated.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the United States respectfully requests that this Court grant the United States' Unopposed Motion to Clarify.

Respectfully submitted,

WAN J. KIM
Assistant Attorney General
Civil Rights Division

/s/ *Jared M. Slade*

JOHN K. TANNER
SUSANA LORENZO-GIGUERE
VERONICA JUNG
JARED M. SLADE
jared.slade@usdoj.gov
Voting Section
Civil Rights Division
United States Department of Justice
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Dated: July 23, 2007                           Washington, DC 20530

<u>CERTIFICATE OF SERVICE</u>

       I, Jared M. Slade, hereby certify that the foregoing document and proposed order filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 23, 2007.

*/s/ Jared Slade*                

Jared M. Slade

Trial Attorney, Voting Section

United States Department of Justice

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-11598-WGY |
| | ) | |
| CITY OF BOSTON, MASSACHUSETTS, | ) | DECLARATION |
| ET AL., | ) | THREE-JUDGE COURT |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION

I, Geraldine Cuddyer, make the following declaration based on personal knowledge:

1.  I am the Chair of the Board of Election Commissioners for the City of Boston, having been appointed to this position in August 2004. In my capacity as Chair, I serve as the Department head for the Boston Election Department. In this role, I oversee all pre-election activities and preparations as well as the conduct of all elections taking place in Boston, and make every effort to ensure that these elections are in compliance with the laws of the United States, the Commonwealth of Massachusetts and the City of Boston. Additionally, I am responsible for overseeing the conduct of the City's annual census listing. Finally, I am charged with ensuring the City's compliance with the Memorandum of Agreement and Understanding ("MOA") between the City of Boston and the United States Department of Justice, which was signed in September 2005.

2.  In April and May, 2007, the City of Boston was required to hold a special preliminary election and a special election in order to fill the position of District Two City Councillor. Included in District Two are Ward 3, Precinct 8, and Ward 5, Precinct 1, which encompass the Chinatown neighborhood and cover the largest numbers of Chinese-surnamed voters in the City (approximately 1000, and 800 respectively). In addition to Ward 3, Precinct 8, and Ward 5, Precinct 1, there are several other precincts within District Two that meet the threshold for Chinese ballots, as established in the MOA. District Two is home to several housing developments,

which house large numbers of elderly Chinese American citizens with limited English abilities.

3. As part of the City's compliance with the MOA, as well as to ensure maximum access and independence for Chinese-speaking voters, the Boston Election Department (the "Department") transliterated the names of seven candidates on the April 17, 2007 special preliminary election ballot and the names of the top two candidates on the May 15, 2007 special municipal election ballot.

4. This was the Department's first effort at transliteration, and was introduced after much discussion with the Department of Justice, the Mayor's Election Advisory Task Force, and outreach to other jurisdictions with extensive experience in the transliterating process. It seemed especially appropriate for the City to begin its transliteration program at this time, due to the large numbers of Chinese-speaking voters expected to participate.

5. As part of the special election preparation process, a letter was sent to all candidates advising them that their names would be transliterated into Chinese. The transliterated names were prepared by Ann Wong, the Chinese Community Liaison under the MOA, and sent to the candidates for their review. The candidates were given the opportunity to review, approve, or to substitute a transliterated name that may have been used in the Chinese media before. None of the candidates submitted a substitute transliterated name. The Department informed the candidates that the agreed upon transliterated names would be provided to the Chinese media. The Department received no complaints from the candidates in District Two either prior to, or after, the elections regarding their transliterated names.

6. As part of her job responsibilities, the Department's Elections Language Coordinator, Helen Wong, researched and adapted a transliteration program to introduce in Boston's Chinese American community. The direction I gave Helen was to ensure that the process adopted by the City of Boston would be acceptable and appropriate for the Chinese-speaking community and the candidate(s). She initially contacted several other jurisdictions to learn how they transliterate and to identify best practices and potential roadblocks in the transliteration process. Helen contacted Los Angeles, Orange County, Santa Clara County and San Francisco. She requested and received copies of their procedures and established email/telephone contacts within their election departments. Helen also contacted members of the Chinese American community in Boston to get their thoughts on the

2

processes identified by these other jurisdictions, and requested feedback on how these practices would likely work in Boston's Chinese American community. Chinese American members of the Advisory Task Force were among those she polled. (The Advisory Task Force grew out of a Voting Rights Task Force established by Mayor Menino in August 2005. An Advisory Task Force is also a requirement of the MOA). In response, Ann Wong responded that most of the Chinese American population Boston seeks to serve with bilingual ballots are Cantonese speakers who cannot speak or read English and suggested that Cantonese would be the appropriate dialect for transliterating (emails attached as "A").

7.  Ann Wong worked on transliterating the candidates' names for the April and May 2007 special elections to appear on the ballot in a manner that would be understandable to Cantonese speakers. Ann has done considerable translation and transliteration of Western names for the Chinese American community along with her husband, Ping Kam Chan, the Assistant Principal of the Quincy Elementary School, a Boston Public School located in the heart of Chinatown. As part of the transliteration process, both Helen Wong and Ann Wong had other Cantonese speakers review the transliterated names for accuracy and appropriateness. After the transliterated names were finalized, they were sent to the candidates for their review and acceptance or substitutions prior to being sent to the Chinese media, so that a standardized name would be used in referring to a candidate in the Chinese press and community.

8.  At the suggestion of Glenn Magpantay at the Asian American Legal Defense and Education Fund ("AALDEF"), the Election Department purchased two Chinese-English dictionaries on the transliteration of first and last Western names. These dictionaries contained the transliterated surnames of six of the seven candidates on the District Two special preliminary election ballot (April 17, 2007). These dictionaries have been used to double-check the accuracy and appropriateness of our transliterations. These publications are: A Dictionary of English Surnames and Christian Names, published by the Foreign Language Teaching and Research Press, and the Oxford Advanced Learner's English-Chinese Dictionary, 6th Edition, published jointly by The Commercial Press and the Oxford University Press.

9.  When the City of Boston initially signed the MOA in the fall of 2005, much of the terminology and practices of serving limited-English speaking populations, with the exception of Spanish, was new to the staff of the Department. This was the first time that the

3

City of Boston attempted to implement a program to address the needs of limited English speaking Chinese and Vietnamese voters on such a large scale. The advice and guidance provided by the Advisory Task Force, as well as the hiring of the Elections Language Coordinator, was invaluable in adapting to meet the needs of Chinese and Vietnamese-speaking voters. Prior to this, the Department relied on translated materials provided by the Secretary of the Commonwealth's Elections Division. Our only resources at that time were the translation service contracted by the state and subsequently used by the City, a company called Translations.com, and the Advisory Task Force.

10. After signing the MOA, the City of Boston had the preliminary and general 2005 municipal elections. As a result, the Election Department contracted for translation services with Translations.com, in order to prepare ballots and other election materials. Given the short preparation time, allowances were made for this in the MOA. At the conclusion of those elections, the next critical step in implementation of the MOA was the hiring of the Elections Language Coordinator, which was completed at the end of March 2006 following a deliberate search with the input and approval of the Advisory Task Force.

11. The Election Department hired Helen Wong as the Elections Language Coordinator and she immediately began researching the best practices of other jurisdictions that provide both Chinese and Vietnamese election materials, including Houston, San Diego, and the other jurisdictions referenced above. Additionally, as part of this research, Helen looked at how other jurisdictions transliterated candidate names into Chinese. She established a review process within the community with native speakers to verify whether the translated and transliterated materials we were using were indeed useful and readable for members of that community.

12. One critical issue Helen Wong discovered included problems with the Vietnamese translations of the voter registration form, provisional ballot information and voting rights information on the signs required by the Help America Vote Act ("HAVA"). This matter came to light over the course of the spring 2006 Special City Council Election in District One. The above-mentioned election materials were printed by the Secretary of the Commonwealth's office and provided to the City. Members of the Vietnamese community and Vietnamese-speaking election officers informed the Boston Election Department that incorrect fonts were used which resulted in election materials which were not in Vietnamese or in any other recognizable language. This suggested

4

to City election officials that there had been no community review of these materials at the state level, and, as a result, underscored the importance of making sure that review happened at the local level.

13.     The difficulties with Vietnamese translation were brought to the attention of the Commonwealth's Elections Division in a meeting held on June 30, 2006. The staff made a presentation on translation and transliteration processes to the Secretary of the Commonwealth's office at the June 30, 2006 meeting (material presented to Secretary of the Commonwealth's office in June 2006 attached as "B").

14.     The June 30, 2006 meeting was attended by John Donovan, Head Assistant Registrar for the City of Boston, Helen Wong, Boston's Elections Language Coordinator, and Michelle Tassinari, the Director of the Secretary of the Commonwealth's Elections Division. At this meeting, Helen provided the Commonwealth with the information she had gathered from other jurisdictions relative to transliteration. This was the first time the City of Boston's Election Department brought specific procedures for Chinese translation of the ballot and transliteration of candidate names to the Secretary of the Commonwealth's Elections Division. The Election Department had previously engaged in informal conversations with the Secretary of the Commonwealth's Elections Division concerning transliteration of candidates' names and the MOA.

15.     Most printed elections materials, with the exception of ballots in municipal elections, are produced by the Secretary of the Commonwealth's office and are provided statewide. In order to authorize the Commonwealth to print a bilingual ballot in Chinese and Vietnamese in Boston, as required by the MOA, a Home Rule Petition had to be passed by the City Council, signed by the Mayor, then passed by the state Legislature, and, finally, signed by the Governor. The Secretary of the Commonwealth testified in favor of this bill before a legislative committee. The Home Rule Petition passed in June 2006.

16.     As the Election Department learned more about the needs of the Chinese American community and gained more confidence in the practice of transliteration, we suggested to the Commonwealth, at the June 30, 2006 meeting, that transliteration was important and made sense when translating the Chinese ballots. The Department also noted that transliteration did not apply to the Vietnamese

5

ballots because written Vietnamese utilizes the standard
Romanized alphabet.

17.    As I have stated, the process for transliteration was undertaken by
the City of Boston Election Department in a careful and thoughtful
manner.  Concerns have been raised that the City did not
transliterate for the Special City Council Election in District One,
which took place in the spring of 2006.  These elections occurred
shortly after Helen Wong's hiring as Elections Language
Coordinator.  As a result, at the time of the elections, we were only
in the beginning stages of researching and creating a process for
transliteration.  The precincts involved were just above the
threshold.  Rather than have a rushed and flawed transliteration
process, the City of Boston did not transliterate for these two
elections.  The City provided Chinese-speaking interpreters for
each of the covered precincts pursuant to the MOA, and trained the
interpreters on how to translate the whole ballot for the voters who
needed them.  We received no calls or complaints regarding the
steps taken to provide assistance to limited-English speaking
Chinese American voters in this district.

18.    On August 7, 2006 I emailed the Commonwealth and expressly
stated the City's interest in providing transliterated names of
candidates on the Chinese ballots for the upcoming September
2006 primary elections.  We offered to do all of the "legwork"
necessary to provide accurate transliterations, including
communicating with the press about standardizing the
transliterations.  The Secretary of the Commonwealth's office,
through the Director of the Elections Division, Michelle Tassinari,
declined, responding, "based upon the translations already done in
Spanish, in which we do not translate the names of the candidates,
it was my recommendation not to transliterate." (copy of email
attached as "C").

19.    On April 4, 2007, prior to the April and May 2007 special election
for City Council in District Two, the City of Boston's
representatives, including myself, met with the Secretary of the
Commonwealth's Elections Division pursuant to an agreement
with the Secretary of the Commonwealth's office, which allows
the Secretary to oversee the City of Boston Election Department
through 2008.  At that meeting, the Election Department presented
our plan for the special elections and we indicated that we would
be providing Chinese ballots with transliterated names in the
required precincts, in order to be in compliance with the MOA.  A
letter from the United States Department of Justice was provided to
the Commonwealth indicating that the MOA required such

transliteration. It was the intention of the City of Boston to transliterate candidates' names on Chinese ballots for municipal elections, where the responsibility for ballot production rests with the City of Boston.

20. There was a question from the Commonwealth as to why we did not let them know that we had planned to transliterate the names prior to this meeting. I responded that we had sent electronic files to the Commonwealth before the meeting but received no response or objection from the Commonwealth. Additionally, we had conducted joint trainings with the Secretary of the Commonwealth's staff in which we demonstrated with a sample English/Chinese ballot which clearly displayed the transliterated names.

21. On October 13, 2006, the City was informed via email (copy of e-mail attached) that new HAVA-compliant machines, AutoMARK machines, with audio capability for disabled voters were being tested for Boston. I expressed concern on behalf of the City as to the introduction of a new voting technology at such a late date before an important election. On October 17, City Election officials met in the office of Cabinet Chief Michael Galvin with state Election officials. It was confirmed that the AutoMARK machines were to be used in the November election. We raised concerns about the late notice, and the ability to provide proper training to election-day poll workers. I also raised the issue that the AutoMARK machines would have to provide visual and audio information in Chinese and Vietnamese, in addition to English and Spanish.

22. On October 23, 2006, the Secretary of the Commonwealth's representative and a representative from the vendor, ES& S, brought the AutoMARK to City Hall for a demonstration for the Election Department. At that session, Helen and I both raised concerns as to whether the machine would have both Chinese and Vietnamese language capabilities. The Secretary of the Commonwealth's representative said it would not be a problem. We responded that the Chinese recording should be in Cantonese and the vendor and the Commonwealth indicated that their intent was to record in Mandarin. We responded that Cantonese was the most prevalent dialect spoken by Chinese American voters in Boston and, therefore, should be used in Boston. The Commonwealth asked the City for a written statement that Cantonese is the most prevalent spoken dialect for the Chinese speakers in Boston, and we provided such written confirmation (copy of e-mail attached as "D").

23.    On Thursday November 2, 2006, I learned from the AutoMARK
       vendor that there was going to be difficulty in providing Chinese
       and Vietnamese recordings on the AutoMARK machines. I told
       the Secretary of the Commonwealth's office that the City's
       Corporation Counsel had advised that we would be in violation of
       the MOA if the audio on the AutoMARK was not available in
       Chinese and Vietnamese. We requested a meeting. Rob
       McGinnis, the machine vendor from ES&S, explained to me that
       his company simply did not have enough time to meet Boston's
       Asian language needs with the AutoMARK – that he was trying to
       do three weeks of work in one week.

24.    On Friday November 3, 2006, four days before the November 7
       election, we met with the Secretary of the Commonwealth's office.
       The Commonwealth confirmed that they would not be able to
       provide Vietnamese and Chinese for the AutoMARK and we told
       the Commonwealth that we would be in violation of the MOA.
       We also expressed concern that a number of disabled voters were
       relying on the presence of the machines and that should one of the
       disabled voters require the language assistance of the machine, it
       would not be available.

25.    The City's Corporation Counsel notified the United States
       Department of Justice of this development.

26.    On Election Day itself, the AutoMARK machines did not work. It
       appeared as though the ballots had not been tested and the
       machines would not mark the ballots properly. The timing marks
       on the ballot apparently did not correspond properly with the
       programmed information and did not allow the ballots to be
       marked. At one point ES&S's advice to our technicians was to
       "shake the ink cartridge." There were several ES&S technicians
       available on Election Day who were dispatched to problem
       locations. The technicians reported that the machines were turned
       on but they could not get them to function. Additionally, none of
       the machines had Chinese or Vietnamese recordings.

27.    In the May and June 2007 special State elections, the City of
       Boston reviewed the accuracy of the Spanish, Chinese and
       Vietnamese language ballots, although the candidate names were
       not transliterated into Chinese on the Chinese ballots in these
       special State elections. We raised issues with the Commonwealth
       about the size of the font used for the Chinese characters on the
       parts of the ballot they translated. The characters were so small as
       to be illegible. The two names on the May ballot and the one name

on the June ballot were not transliterated. This special election, occurring in East Boston, North End and a small part of Beacon Hill, did not affect the precincts in Boston with the highest Chinese populations.

28.  Learning about transliteration and its uses was new to us in the Boston Election Department. We did not embrace the concept lightly and made sure to do research and got feedback from the community it would impact.   We found the transliteration process went very smoothly in the April and May 2007 special elections. In fact, in preparation for the upcoming September 2007 municipal elections, we already have all candidates' names transliterated and ready for review by the candidate and community. The City can build in as many checks as we feel comfortable with to ensure the appropriateness of the transliterated name.

29.  The feedback from our poll workers following the April and May 2007 elections was that the elderly Chinese voters were thrilled to be able to vote independently, and not rely on others for help. That was the City of Boston's goal in transliterating, and I believe it was achieved.

     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, recollection, and belief.

Dated: July 19, 2007

                                   _____
                                   Geraldine Cuddyer

**Wong, Helen**

| | |
|---|---|
| From: | Wong, Ann |
| Sent: | Thursday, June 29, 2006 10:37 AM |
| To: | Wong, Helen |
| Subject: | RE: CHINESE BALLOTS |



*Possible solution : Consult w/ ethnic media*

Hi Helen,

All translations look professional to me. I think the translator is a mandarin speaker. The names are all sounded in mandarin which sound like the English names. If a Cantonese person read a candidate's name in Cantonese, it will not sound like the English name at all, vise verse. I think the important thing is to know who are the people we want to serve the most. My opinion is that we want to educate and empower the ordinary people, not educators or intellectuals. In general, Chinese people who live in suburban are usually have higher education and know English. Therefore, our target will not be these people. I think people who need the translation/transliterating services most are people living in the hub. And the majority of them speaks Cantonese. I hope this will help you. :)

Good luck,
Ann

---

**From:** Wong, Helen
**Sent:** Wednesday, June 28, 2006 2:36 PM
**To:** Ng, Bik; Wong, Ann
**Subject:** CHINESE BALLOTS

Hi Ann and Bik,

First of all, THANK YOU so much for giving me all that feedback, advice and help about translating/transliterating the candidates' names into Chinese. I will be meeting with the lawyer in Sec. Galvin's office this Friday morning, and I plan to bring the attached documents with me to show her what the other municipalities in California are currently doing with regards to that. As you can see, San Francisco and Santa Clara DO translate/transliterate the candidates' names into Chinese, and San Francisco even has a review process for this. (Arcadia currently doesn't translate/transliterate the candidates' names, though.)

So just taking a quick look at these bilingual ballots, what do you think about the Chinese names that they used? Do they make sense – meaning, do they sound like the English names? I just want to make a convincing case (i.e., for Boston to translate the names) when I go up there on Friday. THANK YOU again for all your wonderful help and previous time!!! - Helen ☺

Helen Y. Wong
Language Coordinator
Election Dept., Rm 241
One City Hall Plaza
Boston, MA 02201
(617) 635-3833
Fax (617) 635-4483
http://www.cityofboston.gov/elections/

*Re: Transliteration of Candidates Names*

**Wong, Helen**

| | |
|---|---|
| **Subject:** | Meet with Michelle (SoS) |
| **Start:** | Fri 6/30/2006 10:00 AM |
| **End:** | Fri 6/30/2006 11:30 AM |
| **Recurrence:** | (none) |

(1) Helen Wong
(2) John Donovan
(3) Michelle Tassinari

B

DEPARTMENT OF ELECTIONS
*City and County of San Francisco*



JOHN ARNTZ
*Director of Elections*

## Candidate Names Appearing in Chinese Characters on Ballot
S.F. Municipal Elections Code § 401

The Department of Elections will publish on the ballot a translation or transliteration of each candidate's name in Chinese characters. Candidates may, but are not required to, submit a proposed translated or transliterated Chinese name for themselves. If a candidate does not submit a proposed Chinese name, a transliteration of the candidate's name will be prepared by a qualified translator.

The Director of Elections will determine whether to accept a candidate's proposed Chinese name, and whether a candidate's name will appear as a translation or a transliteration, based on the following:

(1) Information submitted by the candidate regarding whether or not the candidate has an established Chinese name;

(2) Information regarding how the Chinese community refers to the candidate at community meetings and events and in the Chinese press;

(3) Information regarding how the candidate is referred to in campaign materials printed in Chinese;

(4) Whether or not a proposed translation or transliteration has another meaning in the Chinese language; and

(5) Any other information the Director deems relevant in order to prevent voter confusion and to allow for effective participation by the Chinese community in the electoral process.

The Director of Elections' determination whether to accept a candidate's proposed Chinese name, and whether a candidate's name will appear as a translation or a transliteration, shall be final. The Chinese names of all candidates for local office shall be available for public review for ten days, and during that period the Director's determination may be challenged pursuant to California Elections Code section 13313.

| | |
|---|---|
| August 12, 2005, 5:00 p.m. (E-88) | Deadline for candidates for local office to submit a proposed translated or transliterated Chinese name to the Department of Elections. Proposed names should be submitted along with the supporting information and material described above. |
| August 13, 2005, noon – August 23, 2005, noon (E-87 – E-77) | Public review of Chinese names for all candidates for local office. |
| August 23, 2005, 5:00 p.m. (E-77) | Deadline for filing a legal challenge to a candidate's Chinese name. A candidate may challenge the Chinese name designated for him or her by the Department of Elections. A voter may challenge the Chinese name designated for any candidate. |

Revised on 6/6/2005

Department of Elections
*City and County of San Francisco*
#: Dr. Carlton B Goodlett Place, Rm. 48
San Francisco, CA 94102
*John Arntz, Director*

Date Issued: _____

By: _____
*Deputy*



CANDIDATE'S NAME
IN
CHINESE CHARACTERS

DEPARTMENT OF ELECTIONS USE ONLY

I _____«FirstName» «LastName»_____, am a candidate for election to the office of
        *(Print candidate name)*
_____at the election to be held on Tuesday, November 8, 2005.
        *(print office name & district number)*

I understand that:

The Department of Elections, working with a qualified Chinese-language interpreter, will translate/transliterate my name into Chinese characters and include it on all sample and official ballots, along with the English-language version of my name.

I may provide the Department with documentation regarding my regular and consistent use of a particular translation/transliteration in the past, for the purpose of assisting the Department's interpreter. But the Department's decision to accept the translation/transliteration of a candidate's name prepared by the interpreter is final.

☐ I am attaching documentation regarding my regular and consistent use of a particular translation / transliteration.

_____          _____
Signature of Candidate                    Date

Candidate Names Appearing in Chinese Characters on Ballot (SF Municipal Elections Code § 401) on back side

Revised on 060605

Changes for the Chinese Voter Registration Card / Form:

① ② ③ ④ ⑤ } incorrect Chinese character; use 麻 má instead

⑥ incorrect Chinese character; use 偽 Wěi (false; fake) instead

Copies
6/30/06 corrections that were given to Michelle T. (S.S.)

Case 1:05-cv-11598-WGY-PBS-SLL    Document 87-2    Filed 05/23/2007    Page 16 of 25

# 選民郵寄登記表

**本表使用方法:**

1. 請在所有適合的方框內勾選。
2. 正楷書寫姓名:姓、名以及中間名字或字首縮寫。
3. 如適用,請用正楷書寫曾用名。
4. 正楷書寫現住址:號碼和街道名稱或鄉村郵遞號碼及信箱號碼(請勿用郵局信箱號碼)、公寓號碼、市或鎮及郵遞區號。如無法說明地址,請使用右側地圖。
5. 如通信地址與第四欄住址不同,請正楷書寫通信地址。
6. 正楷書寫出生日期:月、日和年。
7. 聯邦法律要求你提供你的駕駛執照號碼以登記選舉。假如你沒有現時有效的麻薩諸塞州的駕照,則你必須提供你的社會安全號碼的最後四位數。假如你兩者都沒有,則你必須在方框內寫「無」。
8. 此欄為任選項。如果填寫電話號碼,但未勾選「未列入電話簿」,電話號碼將成為公共記錄。
9. 勾選所屬政黨、「無黨派」或正楷書寫政治派別(而不是政黨)。
10. 正楷書寫上次登記選舉所用的地址。
11. 如果因不能在本表上簽名,而讓別人幫助填寫本表,代填人必須正楷書寫其姓名、地址和電話號碼(任選項)。
12. 閱讀誓詞。
13. 正楷書寫今天的日期。
14. 簽名。

本表可郵寄或送至您居住地的市政廳。如果郵寄,請將本表折疊封口,貼上一類信件郵票,正楷書寫居住地市鎮名名及市鎮廳郵遞區號,投入任何郵筒。

**本表可用於:**

- 在麻薩諸塞州登記選舉,及/或
- 變更選舉登記姓名和地址;及/或
- 參加政黨、變更所屬政黨或退出政黨。

**在麻薩諸塞州登記選舉,必須:**

- **是美國公民**,及
- 麻薩諸塞州居民,及
- 在下一次選舉時或選舉前,至少年滿十八歲。

**非法登記所受處罰:**不超過一萬美元的罰款或不超過五年的監禁,或兩項並用。

— 麻薩諸塞州法規總則第五十六章第八條。

**必須提供身份證明**

第7項要求你在申請表上提供的駕照號碼或社會安全號碼的最後四位數。這一資料將透過州機動車輛登記處與社會安全局加以核實。假如該資料無法核實或你未提供資料,則你必須在本申請表上或去選舉時在投票站提供你的身份證件。可行的身份證明包括現時有效的帶照片的身份證、現時的水電煤氣賬單、銀行結存單、政府支票、工薪支票或其他能顯示你的姓名和地址的政府文件。

†如無法用街道名稱和號碼或鄉村郵遞號碼和信箱號碼說明地址,請使用醒目標示,標出地址的位置。

[方位圖:北 西 東 南]

---

請使用黑墨水正楷書寫所有欄目。本表送交方法請參閱以上說明。使用本表請勿用影印件,只用表格原件。

**1** 請勾選所有適用項目:你是美國公民嗎? □ 是 □ 不是
在選舉日或選舉日前,你的年齡時將是18歲嗎? □ 是 □ 不是
注意:如果你對這兩個問題都勾選「不是」,則請勿填寫本表格。

**2** 姓名全稱: 姓 名 中間名字或字首縮寫 Jr. Sr. II III IV (如適用,請勾選一項)
小姐 女士 太太 先生

**3** 曾用名(如適用): 姓 名 中間名字或字首縮寫 Jr. Sr. II III IV (如適用,請勾選一項)
小姐 女士 太太 先生

**4** 現住址(街道號碼、街道名稱、鄉村郵道號碼和信箱號碼):
街道號碼/街道名稱/鄉村郵道號碼和信箱號碼 公寓號碼 市或鎮 郵遞區號加四位數

**5** 通信地址(如與第4欄不同):
街道號碼/街道名稱/鄉村郵道號碼和信箱號碼 公寓號碼 市或鎮 郵遞區號加四位數

**6** 出生日期: 月 日 年 **7** 身份證號碼:寫照號碼或社會安全號碼的最後四位數 **8** 電話(任選項):□如未列入電話簿,請勾選 ( ) —

**9** 所屬政黨或派別(勾選一項): □ 民主黨 □ 共和黨
□ 無黨派(未參加) □ 綠黨政治派別(而不是政黨):

**10** 上次登記選舉時所使用的地址:
街道號碼/街道名稱/鄉村郵道號碼和信箱號碼/郵局信箱 公寓號碼 市或鎮 州 郵遞區號加四位數

**11** 如登記人不能簽名,代填人的姓名、地址以及電話(任選項)
姓名 地址 電話號碼(任選項)

**12** 我特此宣誓(證實):我是上述姓名人,上述資料完全屬實;我是美國公民,我不是被禁止登記選舉的受監護人;我未因選舉舞弊行為,而依法暫時或永久剝奪選舉權;我目前未因犯重罪而被監禁;我以上述居住地為住所。簽名將承擔偽證罪之責任。

**13** 今天的日期 月 日 年 **14** 簽名人:在此簽名

*Massachusetts imagine*

## Mail-In Voter Registration Form

William Francis Galvin
Secretary of the Commonwealth

### How to use this form

1. Check all the boxes that apply to you.
2. Print your name: last name, first name, middle name or initial.
3. Print your former name, if applicable.
4. Print the address where you live now: number and street name or rural route number and box number (do not provide a post office box number), apartment number, city or town and full zip code. Use the map† at right if you cannot otherwise identify your address.
5. Print the address where you receive all your mail, if it is different from the address entered on #4.
6. Print your date of birth: month, day and year.
7. Federal law requires that you provide your driver's license number to register to vote. If you do not have a current and valid Massachusetts driver's license, you must provide the last four digits of your social security number. If you have neither, you must write "none" in the box.
8. It is optional to provide your telephone number. If you include your telephone number and do not check "unlisted" it will be a public record.
9. Check a party, 'no party' or print a political designation (not a party).
10. Print the address where you were last registered to vote.
11. If a person is helping you because you are physically unable to sign this form, that assisting person must print his or her name and address and has the option to print his or her telephone number.
12. Read the oath.
13. Print today's date.
14. Sign your name.

*This form may be mailed or hand-delivered to your city or town hall. If mailed, fold the form, tape it closed, place a first class stamp on it, print your city or town name and zip code for that city or town hall and drop into any mailbox.*

**You can use this form to:**
- register to vote in Massachusetts; and/or
- change your name or address for voter registration only; and/or
- join a party, change from one party to another or leave a party.

**To register to vote in Massachusetts you must:**
- **BE A U.S. CITIZEN;** and
- be a Massachusetts resident; and
- be at least 18 years old on or before the next election.

**Penalty for Illegal Registration:** Fine of not more than $10,000 or imprisonment for not more than five years or both.
- Massachusetts General Laws, chapter 56 section 8.

### Identification To Be Provided

Section 7 requires you to include your driver's license number or the last 4 digits of your social security number on this application. This information will be verified through the Registry of Motor Vehicles and the Commissioner of Social Security. If the information cannot be verified or you do not provide this information, you must provide identification either with this application or at your polling location when you go to vote. Sufficient identification includes a copy of a current and valid photo identification, current utility bill, bank statement, government check, paycheck or other government document showing your name and address.

†*Using landmarks, draw the location of the place where you live if you cannot describe that location as a number and street or as a rural route and box number.*

(map with labels: north, west, east, south)

---

Print all information in black ink. Follow above instruction for proper delivery. Do not use a photocopy of this form – use the original only!

**1** Check all that apply: Are you a Citizen of the United States of America? ☐ Yes ☐ No
Will you be 18 years of age or older on or before Election Day? ☐ Yes ☐ No
NOTE: If you checked "no" to **either** of these questions, do not complete this form.

**2** Full name: *last name* / *first name* / *middle name or initial.*
Miss Ms. Mrs. Mr. — Jr. Sr. II III IV *(circle one if appropriate)*

**3** Former name (if applicable): *last name* / *first name* / *middle name or initial.*
Miss Ms. Mrs. Mr. — Jr. Sr. II III IV *(circle one if appropriate)*

**4** Address where you live now (street number, street name, rural route number and box number):
*street number / street name / rural route number and box number    apartment number    city or town    zip code + 4-digit*

**5** Address where you receive all your mail (if different from #4):
*street number / street name / rural route number and box number    apartment number    city or town    zip code + 4-digit*

**6** Date of birth: *month    day    year*
**7** Identification #: *license # or last four digits of your Social Security #*
**8** Telephone (optional): ☐ Check if unlisted ( ) —

**9** Party enrollment or designation (check one): ☐ *Democratic* ☐ *Republican* ☐ *No Party (unenrolled)*
☐ *Political Designation (not a political party):*

**10** Address at which you were last registered to vote:
*street number / street name / rural route number and box number / post office box    apartment number    city or town    state    zip code + 4-digit*

**11** If the applicant is unable to sign this form, give the name, address and telephone number (optional) of the person helping the applicant:
*name    address    telephone number (optional)*

**12** I hereby swear (affirm) that I am the person named above, that the above information is true, that **I AM A CITIZEN OF THE UNITED STATES,** that I am not a person under a guardianship which prohibits my registering to vote, that I am not temporarily or permanently disqualified by law from voting because of corrupt practices in respect to elections, that I am not currently incarcerated for a felony conviction, and that I consider this residence to be my home. Signed under the penalty of perjury.

**13** Today's date: *month    day    year*
**14** Signed: *Sign your name here.*

<u>Changes for the Vietnamese Voter Registration Card/Form</u>:

① Delete ⬚nền⬚

② Reverse ⬚nhận được⬚ ⟩ Front (w/ Address)

③
④ Add ⬚đơn⬚ between mẫu này

⑤ Accent mark needed for ⬚và⬚

⑥ Delete ⬚là⬚

⑦



Bắc

Đông — Correct terms for directions

Nam

⑧ Delete ⬚từ⬚

⑨ Delete ⬚anh⬚ ; replace with ⬚danh⬚

*được nhận*

*Mẫu đơn này phải nhận được tại văn phòng Ghi Danh Bầu Cử địa phương hoặc Ủy Ban Bầu Cử với dấu đóng Bưu Điện trước ngày gia hạn của ghi danh bầu cử (liệt kê dưới đây) cho cuộc bầu cử, sơ bộ, hoặc các cuộc họp sơ bộ của thị xã.*

## HẠN CHÓT CỦA GHI DANH BẦU CỬ

**Đừng đ... ... dùng bản sao lại của mẫu đơn này - chỉ nên dùng bản chính mà thôi!**

*Xin coi lại để chắc chắn rằng quý vị đã điền đầy đủ những chi tiết trong mẫu ghi danh cử tri có lời tuyên thệ ở trang sau!*

| Để tham gia vào... | Quý vị phải ghi danh... |
|---|---|
| sơ bộ tiểu bang<br>bầu cử tiểu bang<br>thành phố và thị xã sơ bộ<br>thành phố và thị xã sơ đẳng<br>những cuộc bầu cử của thành phố và thị xã<br>những cuộc hội họp thường xuyên của thị xã | ít nhất là trước 20 ngày |
| những cuộc hội họp đặc biệt của thị xã | ít nhất là trước 10 ngày |

*Nếu quý vị không nghe tin tức gì từ văn phòng tuyển cử địa phương trong vòng 2 hoặc 3 tuần lễ tới đây, xin gọi cho họ!*

Sao chép mẫu đơn này mà không có sự chấp thuận của Bộ Trưởng Nội Vụ Tiểu Bang sẽ bị ngăn cấm (950 CMR 57.04)

*Xếp dọc theo hàng này*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Địa chỉ gởi tại*

_____
*tên*

_____
*số và tên đường*

*, MA*
_____
*thị xã hoặc thành phố        số zíp*

OFFICIAL ELECTION MALL

**Dán Tem Tại Đây**

**Board of Registrars or Election Commission**

**City or Town Hall**

_____, *MA*
*THÀNH PHỐ HOẶC THỊ XÃ CỦA QUÝ VỊ                          Ố ZIP TÒA THỊ SẢNH THÀNH PHỐ HOẶC THỊ XÃ*

# Ghi Danh Bầu Cử Bằng Cách Gởi Thư
*Cách xử dụng mẫu này* đơn ③

1. Đánh dấu vào tất cả các ô áp dụng cho quý vị.
2. Viết tên của quý vị: tên họ, tên gọi và tên đệm hoặc chữ tắt.
3. Viết tên cũ của quý vị, nếu có.
4. Viết địa chỉ nơi quý vị hiện đang cư ngụ: số nhà, và tên đường hoặc số đường ở thôn quê và số của hộp thư (*không được cho số hộp thư ở bưu điện*),số phòng ở chung cư, thành phố hoặc thị xã và đủ năm số zip. Dùng sơ đồ bên phải nếu quý vị không xác định rõ địa chỉ của mình.†
5. Nếu quý vị nhận thơ ở một địa chỉ khác, không giống như địa chỉ ở phần số 4, xin viết địa chỉ đó vào đây.
6. Viết chữ in ngày sinh của quý vị: tháng, ngày và năm.
7. Luật liên bang đòi hỏi quý vị phải cung cấp số bằng lái xe để ghi danh bầu cử. Nếu không có bằng lái xe hiện còn có hiệu lực của tiểu Bang Massachusetts, thì quý vị phải cung cấp bốn chữ số sau cùng số an sinh xã hội của quý vị. Nếu không có cả hai, thì quý vị phải viết vào ô là "none" (không có).
8. Tùy ý quý vị để cho biết số điện thoại của mình. Nếu quý vị muốn cho biết và *không đánh dấu* vào ô "Đánh dấu nếu muốn số không liệt kê" thì số điện thoại của quý vị sẽ được ghi vô sổ công cộng.
9. Đánh dấu vào phần đảng, "không đăng" hay viết chữ in chỉ định chính trị (không thuộc đảng nào).
10. Viết chữ in địa chỉ nơi quý vị ghi danh bầu cử lần cuối cùng.
11. Nếu có người giúp quý vị điền mẫu đơn này vì quý vị bị bệnh về thể lý không thể ký tên vào đây được,thì người đó *phải* viết tên và địa chỉ cũng như có thể *lựa chọn* để cho biết số điện thoại của họ.
12. Đọc lời tuyên thệ.
13. Viết ngày hôm nay.
14. Ký tên của quý vị.

*Mẫu đơn này có thể gởi bưu điện hoặc mang đến tòa thị sảnh thành phố hay thị xã của quý vị. Nếu gởi, xếp mẫu đơn dán lại, và dán tem vào, viết chữ in tòa thị sảnh thành phố, thị xã và số zip và gởi tại bất cứ thùng thơ nào.*

America Vote Act

*William Francis Galvin*
*Bộ Trưởng Nội Vụ Tiểu Bang*

Quý vị có thể dùng mẫu này để: đơn ④
- ghi danh cho việc bỏ phiếu tại Massachusetts; và hoặc
- chỉ thay đổi tên hoặc địa chỉ cho việc ghi danh bầu cử mà thôi; và/hoặc
- tham gia vào một đăng phái, thay đổi đăng phái, rút ra khỏi một đăng phái.

**Để được ghi danh bầu cử tại Massachusetts, quý vị phải:**
- **LÀ CÔNG DÂN HOA KỲ;** và
- là cư dân của Massachusetts; và ⑤
- ít nhất là 18 tuổi vào trước cuộc tuyển cử tới đây. ⑥

**Hình Phạt cho Việc Ghi Danh Bất Hợp Pháp:** Tiền phạt sẽ không quá $10,000 hoặc phạt tù không quá năm năm hoặc cả hai.
—Luật Tổng Quát của Massachusetts, chương 56, đoạn 8.

**Giấy Nhận Dạng Phải Cung Cấp**

Phần 7 bắt buộc quý vị phải viết số bằng lái xe hoặc 4 chữ số sau cùng của số an sinh xã hội lên đơn này. Thông tin này sẽ được xác nhận qua Ban Đăng Bộ Xe Có Động Cơ và Ủy Ban An Sinh Xã Hội. Nếu không thể xác nhận được thông tin hoặc nếu quý vị không cung cấp thông tin này, thì quý vị phải cung cấp giấy nhận dạng kèm với đơn xin này hoặc tại nơi bỏ phiếu khi đi bầu. Giấy nhận dạng này đủ bao gồm một bản sao giấy cấn cước có dán hình và cư hiệu lực, hóa đơn điện nước hiện hành, tờ khai trình của ngân hàng, chi phiếu của chính phủ, chi phiếu lương hoặc tài liệu khác của chính phủ có tên và địa chỉ của quý vị trong đó.

*†Dùng địa điểm hoặc vị trí, để vẽ nơi quý vị đang cư ngụ nếu quý vị không thể mô tả được như số và tên đường, hoặc đường ở thôn quê và số của hộp thư.*

*Xin viết tắt cả những chi tiết bằng chữ in mực đen. Làm theo những hướng dẫn phía trên để mẫu đơn được gởi tới chính xác.*
**Đừng nên dùng bản sao lại của mẫu đơn này - chỉ nên dùng bản chính mà thôi!**

| **1** Đánh dấu tất cả những điều ứng dụng: Quý vị có phải là Công Dân Hoa Kỳ không? ☐ Có ☐ Không |
|---|
| Quý vị có đủ 18 tuổi vào hoặc trước ngày bầu cử không? ☐ Có ☐ Không |
| GHI CHÚ: Nếu quý vị đánh dấu là "không" vào **một trong** các câu này, thì đừng điền mẫu này. |

| **2** Tên: *tên họ* / Cô.Bà.Ông | *tên gọi* | *tên đệm hoặc chữ tắt* | Jr. Sr. II III IV *(khoanh tròn nếu thích hợp)* |
|---|---|---|---|
| **3** Tên cũ *(nếu có)*: Miss Ms. Mrs. Mr. | *tên gọi* | *tên đệm hoặc chữ tắt* | Jr. Sr. II III IV *(khoanh tròn nếu thích hợp)* |

| **4** Địa chỉ hiện quý vị đang cư ngụ (số và tên đường, số đường ở thôn quê, và số hộp thư): |
|---|
| *số, tên đường/ số đường ở thôn quê và số hộp thư* / *số phòng ở chung cư* / *thành phố hoặc thị xã* / *số zip* |

| **5** Địa chỉ nơi quý vị nhận thư từ (nếu khác hơn số 4): |
|---|
| *số, tên đường/ số đường ở thôn quê và số hộp thư* / *số phòng ở chung cư* / *thành phố hoặc thị xã* / *số zip* |

| **6** Ngày sinh: *tháng ngày năm* | **7** Số nhân dạng: *Số bằng lái xe hoặc bốn chữ số sau cùng số An Sinh Xã Hội của quý vị* | **8** Số điện thoại *(tùy ý)*: ☐ Đánh dấu nếu muốn số không liệt kê ( ) — |
|---|---|---|

| **9** Đảng phái được ghi danh hoặc chỉ định (đánh dấu một ô thôi) ☐ Dân chủ ☐ Cộng Hòa |
|---|
| ☐ Không Thuộc Đảng Phái (không ghi danh) ☐ Chỉ Định Chính Trị (không phải đảng chính trị): |

| **10** Địa chỉ nơi quý vị ghi danh bầu cử lần cuối cùng: |
|---|
| *số, tên đường/ số đường ở thôn quê và số hộp thư* / *số phòng ở chung cư* / *thành phố hoặc thị xã* / *số zip* |

| **11** Nếu người làm đơn không thể ký mẫu đơn này, viết tên, địa chỉ và số điện thoại (tùy ý) của người đã giúp quý vị điền đơn: |
|---|
| *tên* / *địa chỉ* / *số điện thoại* *(tùy ý)* |

| **12** Tôi xin thề (xác nhận) nơi đây rằng tôi là người có tên ở trên, rằng tất cả những dữ kiện trên đây đều là sự thật, rằng **TÔI LÀ CÔNG DÂN HOA KỲ**, rằng tôi không bị một sự giám hộ nào ngăn cấm cho việc ghi danh bầu cử của tôi, rằng tôi không bị loại một cách tạm thời hoặc vĩnh viễn bởi pháp luật trong việc bỏ phiếu vì những hành vi đối bại liên quan đến việc tuyển cử, rằng tôi hiện không bị giam giữ vì bị kết án về một trọng tội và rằng tôi công nhận mọi lời xác nhận này là sự thật dưới của hình mọi quả và hình phạt trong trường hợp bội thề. |
|---|

| **13** Ngày hôm nay: *tháng ngày năm* | **14** Ký tên: *Quý vị ký tên ở đây.* |
|---|---|

## Cuddyer, Gerry

| | |
|---|---|
| **From:** | Cuddyer, Gerry |
| **Sent:** | Monday, August 07, 2006 3:05 PM |
| **To:** | 'Tassinari, Michelle @ SEC' |
| **Subject:** | RE: Transliteration |

Hi Michelle: That may be a good solution.    We will see what we can do with it.    Thanks  --Gerry

Geraldine M. Cuddyer
Chair, Board of Commissioners,
Boston Election Department

-----Original Message-----
**From:** Tassinari, Michelle @ SEC [mailto:Michelle.Tassinari@state.ma.us]
**Sent:** Monday, August 07, 2006 2:55 PM
**To:** Cuddyer, Gerry
**Subject:** RE: Transliteration

HI Gerry-

We will not be transliterating the names of the candidates.  Based upon the translations already done in Spanish, in which we do not translate the names of the candidates, it was my recommendation not to transliterate.

However, you mention Helen's contacts with the Chinese press.  Do you think they would be amenable to printing the candidate's names in English next to the transliterated names they put in the paper?  This way the voters would be familiar with the English names as well?

Michelle

**From:** Cuddyer, Gerry [mailto:Gerry.Cuddyer@cityofboston.gov]
**Sent:** Monday, August 07, 2006 2:50 PM
**To:** Tassinari, Michelle (SEC)
**Cc:** Donovan, John (Election); Wong, Helen
**Subject:** Transliteration

Hi Michelle: I hope all is well with you.   I know that John and Helen had met with you in the past and the subject of transliteration of names on the Chinese ballots was discussed. I just want to make sure that it is clear that Boston would be willing to do the "legwork" on this issue, should you have any concerns about time, etc.   I certainly don't want to put any more added burden on your staff:  you have all been so helpful to us already!  Some of the members of our Task Force had already suggested that the easiest way to do this would be to use the "transliterated" name as employed by the Chinese press.  Helen has established some wonderful relationships with the Chinese press, and we would also be willing to make sure that we had community people review the information as well.    I know that I am learning more and more about these issues as we go along, so whatever we can do to be helpful to you, in the interest of providing the best info to the voters, we would be more than happy to do.  --Gerry

Geraldine M. Cuddyer
Chair, Board of Commissioners,
Boston Election Department

**C**

## Cuddyer, Gerry

| | |
|---|---|
| **From:** | Cuddyer, Gerry |
| **Sent:** | Monday, October 23, 2006 2:32 PM |
| **To:** | 'Tassinari, Michelle @ SEC' |
| **Subject:** | Cantonese |

Hi Michele:  Just confirming that Cantonese is the most prevalent spoken Chinese dialect among Boston's voters.

Geraldine M. Cuddyer
Chair, Board of Commissioners,
Boston Election Department

-----Original Message-----

10/23/06

Gerry -
Please e mail Michelle
(SoS) about using
Cantonese as the dialect
on the machines. She
wants/needs it in writing.
Thanks!
- Helen

D

11/30/2006

## Cuddyer, Gerry

**From:** Cuddyer, Gerry
**Sent:** Monday, October 16, 2006 11:20 AM
**To:** 'Tassinari, Michelle @ SEC'
**Subject:** RE: Accessible Voting Equipment

That sounds great.  See you then.

Geraldine M. Cuddyer
Chair, Board of Commissioners,
Boston Election Department

> -----Original Message-----
> **From:** Tassinari, Michelle @ SEC [mailto:Michelle.Tassinari@state.ma.us]
> **Sent:** Monday, October 16, 2006 11:11 AM
> **To:** Cuddyer, Gerry
> **Cc:** Donovan, John (Election); Piemonte, Sabino; Chinetti, Michael; Simmons, Bridget @ SEC
> **Subject:** RE: Accessible Voting Equipment

Hi Gerry-

How about tomorrow morning at 10am?  We can come down to you.

Michelle

**From:** Cuddyer, Gerry [mailto:Gerry.Cuddyer@cityofboston.gov]
**Sent:** Monday, October 16, 2006 11:07 AM
**To:** Tassinari, Michelle @ SEC
**Cc:** Donovan, John (Election); Piemonte, Sabino; Chinetti, Michael
**Subject:** RE: Accessible Voting Equipment

Hi Michelle:   Anytime tomorrow would be fine.  I have a conflicting appt on Wednesday morning, but Wednesday afternoon would be okay. As I am sure you can appreciate, we are very concerned with the introduction of a totally new voting process at this late date in such an important election.  We look forward to discussing our concerns with you.

Geraldine M. Cuddyer
Chair, Board of Commissioners,
Boston Election Department

> -----Original Message-----
> **From:** Tassinari, Michelle @ SEC [mailto:Michelle.Tassinari@state.ma.us]
> **Sent:** Friday, October 13, 2006 5:46 PM
> **To:** Cuddyer, Gerry
> **Cc:** Simmons, Bridget @ SEC; Piemonte, Sabino; Donovan, John (Election)
> **Subject:** Accessible Voting Equipment

Hi Gerry-

I am writing to inform you that we will be renting accessible voting equipment for the November 7,

11/30/2006

2006, State Election which will be provided to the City of Boston.  I was wondering if you would be available early next week to meet to discuss logistics including placement of machines, training, etc.

Please call me to discuss further.

Thanks and have a great weekend!

Michelle K. Tassinari
*Director/Legal Counsel, Elections Division*
*Office of the Secretary of the Commonwealth*
*One Ashburton Place, Room 1705*
*Boston, MA 02108*
*617-727-2828*
*Fax: 617-742-3238*

## LEGAL NOTICE

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by return email and delete the original message and all copies of the message and any attachments to it.
The Office of the Secretary of the Commonwealth does not accept any liability for viruses.  Please ensure that adequate virus protection is in place before opening any attachments.

**The substance of this message, including any attachments, may be confidential, legally**
**privileged and/or exempt from disclosure pursuant to Massachusetts law. It is intended**
**solely for the addressee. If you received this in error, please contact the sender and**
**delete the material from any computer.**

11/30/2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-11598-WGY |
| | ) | |
| CITY OF BOSTON, MASSACHUSETTS, | ) | DECLARATION |
| ET AL., | ) | THREE-JUDGE COURT |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION

I, Lydia Lowe, make the following declaration based on personal knowledge:

1. I recall making the statements in the attached declaration from August 2005. The statements in that declaration are accurate.

2. I am a member of the Mayor's Election Advisory Committee formerly known as the Voter Outreach and Education Task Force. I was appointed to the Task Force because of my position in the Chinese community and because of my involvement in the lawsuit between the Department of Justice and the City of Boston as well as my participation in the intervention.

3. I am the Executive Director of the Chinese Progressive Association ("CPA") and have been on the staff of the CPA continuously since 1987. CPA has worked actively on non-partisan education and mobilization often through our voter education workshops. CPA has also been involved in the monitoring of elections and assisting the Chinese community learn about their voting rights.

4. Since the Memorandum of Agreement was entered in the DOJ lawsuit against the City, CPA has worked closely with the Boston Election Department to make sure that Chinese translations are accurate and consistent, both on the ballot and in other voting materials. Among other things, the CPA helps the City recruit Chinese-speaking poll workers to work at polls servicing the Chinese-speaking community on election day.

5. Since the Memorandum of Agreement, the City has made a strong and sincere effort to protect Chinese-speaking voters' rights and to provide Chinese-speaking voters the tools they need in order to vote independently. These tools include translation of

**Exhibit B**

ballots and other voting materials such as signage and media releases in the Chinese media. Also, this effort has included increased availability of Chinese bilingual assistance at the polls.

6. Commissioner Geraldine Cuddyer and the staff at the City's Election Department regularly check with CPA about the accuracy of translations and always follow up on any concerns registered by voters in a timely manner.

7. I first raised with the City the issue of whether candidates' names would be transliterated on the Chinese bilingual ballot before the November 2005 election. I raised this issue within the City's Voter Outreach and Education Task Force in November 2005.

8. For the November 8, 2005 election, the City had not yet implemented bilingual program or ballots but did provide a Chinese-bilingual specimen ballot for the election. The specimen ballot consisted of an actual ballot fully translated into Chinese that voters could use as an aid when they went to the polls to vote, but would not vote with. The City's specimen ballot was similar to specimen ballots the CPA has provided to voters in the past. CPA members and staff worked closely with Commissioner Cuddyer to edit and improve the Chinese translation of the specimen ballot. At that time I again pointed out the importance of transliterating the names in Chinese in future elections. Commissioner Cuddyer informed us that the City would not be able to transliterate the names in time for the November election, but that the City intended to do so in the future.

9. Prior to the September 2006 state primary I asked the City, through the Task Force, if it would be transliterating the ballot. At that time the City was not certain and was discussing the issue with the Secretary of the Commonwealth's office. It was necessary to talk with the Secretary of the Commonwealth's office because his office was printing all the ballots for this election, including those used by Chinese-speaking citizens of Boston.

10. The members of the Task Force were told that the Secretary of the Commonwealth would not allow transliteration of candidate names on ballots prepared by his office for the September and November 2006 election. According to the City, the Secretary of the Commonwealth was concerned about lawsuits arising from inaccurate translations of candidates' names and generally was not interested in assuming the possible administrative burden involved with transliterated ballots.

11. After the Secretary of the Commonwealth refused to transliterate candidates' names for the September and November 2006 election, I suggested alternatives to address the concerns of the Secretary. For instance, during a Task Force meeting prior to the September 2006 State Primary, I raised with Commissioner Cuddyer concerns about coordinated, write-in and/or sticker campaigns being conducted by two Democratic candidates for the State Representative seat of the district that includes Chinatown, parts of Mission Hill, and the South End. These candidates needed to conduct such campaigns because they did not collect enough signatures before the deadline and were the only candidates running in the primary. I remember a similar sticker campaign was used by a

Latino candidate running for State Representative in the 1990's. Generally, a sticker campaign involves voters going to polls with stickers pre-printed with their preferred candidate's name. Voters then place these stickers at the location on the ballot for write-in candidates. Such stickers are generally distributed by each candidate's campaign organization. For this election, I was concerned that Chinese-speaking voters' access to the process would be greatly limited if they were required to write in English their vote or if, as was being planned, the stickers approved by the Secretary of the Commonwealth for use in the election were only in English. So I asked Commissioner Cuddyer to speak to the Secretary of the Commonwealth's office about allowing Chinese-speaking citizens to use stickers that had their preferred candidate's name transliterated into Chinese. Alternatively, I wanted to know if the write-in stickers for the two candidates could be in different colors so Chinese-speaking voters could distinguish between each candidates' stickers. Neither of my suggestions were accepted by the Secretary of the Commonwealth's office. The primary election occurred and, because there were no Democratic candidates' names appearing on the ballot, Chinese-speaking voters that wanted to participate in the Democratic primary had to write their preferred candidate's name in English on the ballot or use stickers printed in English.

12. After the Secretary of Commonwealth's office refused to transliterate candidate names and the other alternative suggestions to address his concerns, CPA transliterated the names on a copy of the ballots used in the September and November 2006 election, which the CPA distributed at its voter workshops to show voters where the names would appear on the ballot. During these workshops, we had to teach voters to count down the names or ovals on the ballot and look at the first letter of the candidate's name. It is very difficult for Chinese-speaking voters to read English names, so they have to rely on counting the names or ovals to find their candidates on ballots. This was difficult in this election because the ballot was two pages. Voters that wanted to participate in elections other than the gubernatorial election, for instance the elections for the State Senate, had to count down 15 to 20 candidates' names before they found their preferred candidate's name. This was made even more confusing by the write-in candidates' campaign. Also, many voters were confused about whether to count the ovals or the names. CPA encouraged voters to take their sample ballots to the polls to guide them. Even with this training and the sample ballots CPA provided to voters, voting in the September and November 2006 election was very confusing for Chinese-speaking voters.

13. I obtained a copy of the September 16, 2006 poster-sized copy of the sample ballot from the City. I used this ballot to conduct voter education workshops. While the names of the candidates did not appear in Chinese transliterated characters, the Secretary of the Commonwealth transliterated several other words in portions of the ballot, including: the heading of the ballot "Commonwealth of Massachusetts," the subscript under the Secretary's signature on behalf of the "Commonwealth of Massachusetts," the "Suffolk County Senator of the General Court," the "Middlesex County Senator of the General Court," the "Suffolk County Representative of the General Court," the "Suffolk County Clerk of the Supreme Court," the "Suffolk County Clerk of Superior Court," and the "Suffolk County Register of Deeds." Since there is no direct translation of names

such as Massachusetts, Suffolk or Middlesex, all of these names appear as transliterations on the ballot produced by the Commonwealth of Massachusetts.

14.    Despite our efforts to educate the Chinese community, many Chinese voters were approached by campaigners on the street or at the entrance of the polls with their own partisan, marked campaign literature. (Attached)  Without transliterated candidate names, these voters had difficulty differentiating between official and partisan election materials

15.    I attended the Election Advisory Committee's post-election review meeting following the November 2006 election and reiterated to the committee the need to have the candidates' names transliterated on future ballots.  The meeting occurred on or about November 29, 2006.  I talked to the committee about problems voters had using a ballot that had English names only.

16.    After Commissioner Cuddyer notified the CPA that the ballots for the April and May 2007 election would be transliterated, the CPA coordinated our workshop and materials so that we could include the official transliteration of candidate names that would be included on the ballots.  Also, we publicized in our voter newsletter to the Chinese community that the ballots in this election would feature the transliterated names of candidates.

17.    On the day of the April 2007 election, I heard feedback that many voters were pleased with how easy it was for them to vote because of the transliteration of the candidates' names on the ballots.  The voters were pleased to see that the transliteration on the ballot consistently matched the transliteration that we covered in the CPA workshops and that were used in the local papers serving the Chinese-speaking community.

18.    I learned that the Secretary of the Commonwealth was not planning to transliterate the names of the candidates for the State Special Election following the City's April and May 2007 elections.

19.    On June 21, 2007, I sent a letter to the Secretary of the Commonwealth's office about its opposition to transliteration and to explain how important this issue was to the Chinese community.  I requested that he allow a small group of Chinese community leaders to meet with the Secretary or his staff to help his office understand the need for transliteration of candidate names. On June 26, 2007, I contacted his office to follow up on my letter and to try and schedule the suggested meeting with member of the Chinese community.  I wanted to meet with the Secretary before the July 10, 2007 court deadline, to help his office understand the concerns of our community and the need for transliteration.  However, my request to schedule a meeting was declined.

20.    When Chinese voters read transliterated names, they are not looking at these characters as a literal translation, but are associating the transliteration with the phonetics of an English name and with the person.  They certainly are not poking fun at

that someone named Green was a green person.  It is offensive and culturally insensitive to Boston's Chinese community and to Chinese Americans everywhere to assume that Chinese voters are reading transliterations literally rather than associating the name with the person, just as English speakers do.


I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, recollection, and belief.

Dated: July 20, 2007

_____

Lydia M. Lowe

# The Commonwealth of Massachusetts
## Estado de Massachusetts

**STATE PRIMARY**
**DEMOCRATIC PARTY**
**OFFICIAL**
**ABSENTEE**
**BALLOT**

**PRIMARIA DEL ESTADO**
**PARTIDO DEMÓCRATA**
**PAPELETA**
**OFICIAL**
**VOTO EN AUSENCIA**

BOSTON
WD. 3, Pct. 7, 8
WD. 4, Pct. 1-3
WD. 5, Pct. 1, 3
WD. 9, Pct. 1-3

TUESDAY, SEPTEMBER 19, 2006 / MARTES, 19 DE SEPTIEMBRE DEL 2006

To vote for a candidate, fill in the oval ● to the right of the candidate's name. To vote for a person not on the ballot, write that person's name and residence in the blank space provided and fill in the oval ●.

Para votar por un candidato, rellene el óvalo ● que está a la derecha del nombre del candidato. Para votar por una persona que no está en la papeleta de votación, escriba el nombre y la dirección de esa persona en el espacio correspondiente y rellene ese óvalo.

**SENATOR IN CONGRESS**
**SENADOR DEL CONGRESO**
Vote for ONE / Vote por UNO

- EDWARD M. KENNEDY 99 Marchant Ave., Barnstable
  Present U.S. Senator; Candidate for re-nomination
  Actual Senador de Estados Unidos; Candidato para volverse a nominar
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**GOVERNOR**
**GOBERNADOR**
Vote for ONE / Vote por UNO

- CHRISTOPHER F. GABRIELI 4 Louisburg Sq., Boston
- DEVAL L. PATRICK 29 Westley Rd., Milton
- THOMAS F. REILLY 41 Palfrey St., Watertown
  Present Massachusetts Attorney General; former District Attorney
  Actual Procurador General de Massachusetts; ex fiscal auxiliar de distrito
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**LIEUTENANT GOVERNOR**
**VICE GOBERNADOR**
Vote for ONE / Vote por UNO

- DEBORAH B. GOLDBERG 37 Hyslop Rd., Brookline
- TIMOTHY P. MURRAY 35 Intervale Rd., Worcester
- ANDREA C. SILBERT 55 Smith St., Harwich
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**ATTORNEY GENERAL**
**PROCURADOR GENERAL**
Vote for ONE / Vote por UNO

- MARTHA COAKLEY 46 Coolidge Rd., Medford
  Present Attorney General; Actual Fiscal de Distrito
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**SECRETARY OF STATE**
**SECRETARIO DE ESTADO**
Vote for ONE / Vote por UNO

- WILLIAM FRANCIS GALVIN 46 Lake St., Boston
  Present Secretary of the Commonwealth; Candidate for re-nomination
  Actual Secretario de Estado; Candidato para volverse a nominar
- JOHN BONIFAZ 6 Revere St., Boston

**TREASURER**
**TESORERO**
Vote for ONE / Vote por UNO

- TIMOTHY P. CAHILL 11 Greenleaf Rd., Quincy
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**AUDITOR**
**AUDITOR**
Vote for ONE / Vote por UNO

- A. JOSEPH DeNUCCI 109 Warwick Rd., Newton
  Present State Auditor; Actual Auditor Estatal
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**REPRESENTATIVE IN CONGRESS**
**REPRESENTANTE EN EL CONGRESO**
EIGHTH DISTRICT / DISTRITO OCTAVO
Vote for ONE / Vote por UNO

- MICHAEL E. CAPUANO 172 Central St., Somerville
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**COUNCILLOR**
**CONCEJAL**
FOURTH DISTRICT / DISTRITO CUARTO
Vote for ONE / Vote por UNO

- CHRISTOPHER A. IANNELLA, JR. 283 Pearl St., Boston
  Present Governor's Councillor; Candidate for re-nomination
  Concejal actual del Gobernador; Candidato para volverse a nominar
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**SENATOR IN GENERAL COURT**
**SENADOR DEL TRIBUNAL GENERAL**
SECOND SUFFOLK DISTRICT / DISTRITO SEGUNDO DE SUFFOLK
Vote for ONE / Vote por UNO

- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**REPRESENTATIVE IN GENERAL COURT**
**REPRESENTANTE EN EL TRIBUNAL GENERAL**
THIRD SUFFOLK DISTRICT / DISTRITO TERCERO DE SUFFOLK
Vote for ONE / Vote por UNO

- SALVATORE F. DiMASI 220 Commercial St., Boston
  Candidato para volverse a nominar
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**DISTRICT ATTORNEY**
**FISCAL DE DISTRITO**
SUFFOLK DISTRICT / DISTRITO DE SUFFOLK
Vote for ONE / Vote por UNO

- DANIEL F. CONLEY 255 Corey St., Boston
  Present District Attorney; Actual Fiscal de Distrito
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**CLERK OF SUPREME JUDICIAL COURT**
**SECRETARIO DEL TRIBUNAL SUPREMO DE JUSTICIA**
SUFFOLK COUNTY / CONDADO DE SUFFOLK
Vote for ONE / Vote por UNO

- MAURA DOYLE 118 Milton St., Boston
  Candidata para volverse a nominar
- PETER J. WALSH 519 Ashmont St., Boston
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**CLERK OF SUPERIOR COURT**
**(CIVIL BUSINESS)**
**SECRETARIO DEL TRIBUNAL SUPERIOR**
**(ASUNTOS CIVILES)**
SUFFOLK COUNTY / CONDADO DE SUFFOLK
Vote for ONE / Vote por UNO

- MICHAEL JOSEPH DONOVAN 540 East Fifth St., Boston
  Candidato para volverse a nominar
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**CLERK OF SUPERIOR COURT**
**(CRIMINAL BUSINESS)**
**SECRETARIO DEL TRIBUNAL SUPERIOR**
**(ASUNTOS PENALES)**
SUFFOLK COUNTY / CONDADO DE SUFFOLK
Vote for ONE / Vote por UNO

- ROBERT J. DELLO RUSSO 24 Floyd St., Boston
  Secretario actual del Tribunal
- MAURA A. HENNIGAN 56 Woodland Rd., Boston
  Ex Consejal de la ciudad de Boston
- WRITE-IN SPACE ONLY / ESCRIBA ÚNICAMENTE EN EL ESPACIO

**REGISTER OF DEEDS**
**REGISTRO DE ESCRITURAS**
SUFFOLK DISTRICT / DISTRITO DE SUFFOLK
Vote for ONE / Vote por UNO

- MICKEY ROACHE 16 Carson St., Boston
  Present Boston City Clerk; Candidate for re-nomination
  Candidato para volverse a nominar; Wtrong

請踴躍參加投票，使我們社區得到更加多的福祉，多謝

投票時請將卵型○塗黑

投下列之號碼候選人 19号 23号 24号 28号 33号

親愛的華人選民九月十九日星期二是初選日我們誠懇地請你神聖一票

選票樣本由華埠選民教育委員會提供

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION No. 05-11598 |
| | ) | |
| CITY OF BOSTON, | ) | DECLARATION |
| MASSACHUSETTS; THOMAS M. | ) | |
| MENINO, in his official capacity as | ) | THREE-JUDGE COURT |
| Mayor of the City of Boston; | ) | |
| BOSTON CITY COUNCIL: | ) | |
| MICHAEL F. FLAHERTY, PAUL J. | ) | |
| SCAPICCHIO, JAMES M. KELLY, | ) | |
| MAUREEN E. FEENEY, | ) | |
| CHARLES C. YANCEY, ROB | ) | |
| CONSALVO, JOHN TOBIN, | ) | |
| CHUCK TURNER, MICHAEL P. | ) | |
| ROSS, JERRY P. MCDERMOTT, | ) | |
| FELIX D. ARROYO, MAURA | ) | |
| HENNIGAN, STEPHEN J. | ) | |
| MURPHY; BOSTON ELECTION | ) | |
| DEPARTMENT; GERALDINE | ) | |
| CUDDYER, in her official capacity | ) | |
| as Chair of the Boston Election | ) | |
| Department, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION

I, Lydia Lowe, make the following declaration based on personal knowledge:

1. I am the Executive Director of the Chinese Progressive Association (CPA). I have

been on staff at CPA since 1987. CPA is a non-profit organization, founded in 1977, that works

for full equality and empowerment of the Chinese community in greater Boston and eastern

Massachusetts. CPA prides itself on involving ordinary people in its decision-making. CPA

sponsors the Campaign to Protect Chinatown, which organizes Chinatown residents to have a voice in neighborhood decision-making and development. CPA has a Worker's Center, which focuses on helping immigrant workers learn about and obtain their workplace rights. CPA's Chinese Youth Initiative is a youth leadership development program. The Community Empowerment Project, which includes voter education work, attempts to increase civic participation. Finally, CPA sponsors an Adult Education Program, which provides English and U.S. citizenship classes.

2. Through the course of our work, CPA attempts to empower Chinese-Americans to voice their own concerns. However, oftentimes, CPA also plays the role of advocate. CPA receives complaints from our residents, especially through our work on workers' rights and Chinatown development. CPA gathers complaints and attempts to have them resolved on behalf of the community by lobbying and corresponding with the appropriate city department.

3. CPA has been involved with voter registration since I began with the organization in 1987, initially concentrating on the Chinatown area. Since 2000, CPA has expanded its geographic reach to other Chinese communities in the City and its commitment to getting the Chinese community involved in the electoral process. In the past five years, CPA has conducted voter registration drives, provided voter education workshops, developed non-partisan information about candidates and proposition questions that we have translated into Chinese and distributed in the community, and sponsored get-out-the-vote efforts. On election day, CPA volunteers monitor voting activities in the polls, provide transportation to the polls for elderly voters, and, in some instances, translation assistance to limited English proficient voters who have requested it.

4. For the 2003 municipal preliminary election, we obtained permission from the City to place monitors in the polls in Chinatown, Mission Hill, and the South End. These are areas of the City with high concentrations of Chinese-American voters. CPA monitors posted at the Franklin Institute, a polling place located in the South End, and the Quincy School, located in Chinatown, reported serious election-day problems to me.

5. CPA monitors at the Franklin Institute reported that there were not enough bilingual, Chinese-speaking poll workers to handle the strong turnout of Chinese, limited English proficient voters. In addition, CPA monitors reported that the single, bilingual poll worker at the poll targeted elderly, limited English proficient voters and forced her assistance upon them, without their asking for it. In addition, she would mark their ballots without consulting with the voters to find out for whom they wanted to vote.

6. CPA monitors at the Quincy School reported the following: electioneering within the prohibited area; poll workers forcing themselves upon voters, telling them for whom to vote; a lack of privacy at the voting booth; bilingual poll workers whose Chinese was not proficient to assist voters effectively; and 14 voters, most of whom were limited English proficient, being turned away from the polls without being offered an escrow ballot.

7. Based on these reports from CPA monitors, I drafted letters dated September 25, 2003 and October 14, 2003 to Nancy Lo, Election Commissioner for the City of Boston. Additionally, I drafted a letter dated October 14, 2003 to Michelle Tassinari, Legal Counsel to the Secretary of State. See exhibits A, B, and C.

8. Ms. Lo responded by letter, requesting the identity of voters with complaints and the names of the voters turned away during the preliminary election. The letter suggested that the City could not investigate further without this additional information. Ms. Lo made no

commitment in this letter to take steps to correct the problems we reported. I was not able to locate a copy of Ms. Lo's response in my files. In response to Ms. Lo's letter, I forwarded her three John Doe affidavits from voters and an affidavit from CPA staffer Karen Chen. In addition, I forwarded her the names of the 14 voters that CPA monitors observed being turned away without being offered an escrow ballot.

9. I served as a CPA monitor during the November 2003 final election. I was stationed at the Franklin Institute. The poll had only one bilingual, Chinese-speaking poll worker, Amy Wang. When I arrived at the poll, the warden said, "Great, another Chinese speaker." I told him that I was there as an observer, that I was not supposed to talk to the voters. The warden, a non-Asian man, said that he really needed my help because Amy could not help all of the Chinese voters. I agreed to help. My job was to ask voters in Chinese for their names and addresses so the poll workers could look them up.

10. While I was helping sign voters in, I observed Amy Wang assisting several elderly Chinese-speaking voters. I suspected that she was pushing her help upon voters because she was approaching voters without their requesting her assistance. When I got a break from checking in the voters, I watched Amy as she approached two elderly Chinese voters, perhaps a couple, as they neared the voting booths. I saw Amy take their ballots from them and lead them into a voting booth. There, Amy marked both voters' ballots without consulting the voters. The voters did not react. I could see Amy clearly, as the voting booths did not provide much privacy, and I was only about 20 feet away. I then said to her, "You're not supposed to do that." Amy responded that she could tell whom the voters wanted based on the campaign flyers they were holding. I turned to the warden and told him that Amy was forcing herself upon voters and voting for them without their input. The warden said that he was sure that none of the poll

workers would do anything improper. Amy then stood to the side with her arms crossed and a sour look on her face and refused to help any voters for a period of time.

11. After the November final election, I drafted a letter dated November 17, 2003 to Michelle Tassinari at the Secretary of State's office. I pointed out that the City had not implemented the Secretary of State's most crucial recommendations – i.e., those most important for ensuring meaningful access to the voting process. Most significantly, the City failed to replace the poll workers at the Quincy School and Franklin Institute, including the warden at the Quincy School, who observed the irregularities and did nothing to correct them. And while the City appointed additional bilingual poll workers, the City did not provide these new workers any training, instructing them to "just show up and do what the warden says." See exhibit D. I did not copy the City on this letter or draft a separate letter to the City because I did not think further correspondence with the City would be productive based on Mayor Menino's remarks to the press on October 25, 2003. Despite our letters of complaint, John Doe affidavits from three voters and a CPA staff member, and coverage in the press, the Mayor had announced at the October 25 press conference that there were only "minor glitches" during the preliminary election. Additionally, at this press conference, the Mayor claimed that no complaints from voters had been received.

12. In the past, CPA has made it clear to the City that it would assist in recruiting bilingual, Chinese poll workers. On our own initiative we have contacted the City for information on poll worker recruitment and requested poll worker applications. Until 2005, the City had never contacted us regarding recruitment of bilingual, Chinese poll workers. On March 8, 2005, I received an e-mail from the City asking for bilingual poll worker applicants for the March 15, 2005 special election. Because we received just one week's notice from the City, we did not have sufficient time to initiate a comprehensive search for applicants. After the Department of Justice filed its complaint in this case on July 29, 2005, and the mayor announced the formation of the voting rights task force in August, 2005, I suddenly received four different e-mails on poll worker recruitment.

13. Based on my years of experience with CPA and work in the recent elections, I would recommend the following steps to improve the voting experience of limited English proficient voters: an increase in the number of fully bilingual and trained Chinese-speaking poll workers, bilingual ballots, bilingual voting instructions, bilingual signs, prominently-posted bilingual signs about voters' rights, voting booths with curtains or some other mechanism to ensure privacy, a uniform policy concerning required voter identification, a community oversight/compliance task force, bilingual address verification and polling site notifications, and a means by which limited English proficient voters could obtain voting information from the Elections Department and make complaints by phone in Chinese. In addition, the City should provide bilingual absentee ballot applications, instructions and absentee ballots. Finally, voters should have a right to translation assistance in Chinese, assistance from someone of the voters' choice, and also the right to be free from poll workers foisting their assistance upon them.

I declare under the penalty of perjury and pursuant to Title 28 of the United States Code, Section 1746, that the foregoing is true and correct to the best of my knowledge, recollection, and belief.

Dated: August 22, 2005

Lydia Lowe

# EXHIBIT A

**Letter of September 25, 2003**
From:  Lydia Lowe, Executive Director of the Chinese Progressive Association (CPA)
To:      Nancy Lo, Election Commissioner for the City of Boston
Re:      2003 Municipal Preliminary Election



華人前進會
**Chinese Progressive Association**
*33 Harrison Avenue, 3rd Floor, Boston, MA 02111*
*Tel: (617) 357-4499 Fax: (617) 357-9611 www.cpaboston.org*

September 25, 2003

Nancy Lo
Election Commissioner
One City Hall Plaza
Boston, MA 02201

Dear Commissioner Lo:

I am writing to register a complaint regarding the organization of the polling site at the Josiah Quincy School, Ward 3 Precinct 8, and to request the Election Department's rectification of this situation in time for the final election on November 4.

As you know, the Chinese Progressive Association has been working cooperatively with the Election Department on non-partisan voter education efforts to demonstrate the use of the new ballots and voting machines. We appreciate the department's recent outreach efforts as well as its record of cooperating with community and neighborhood groups to spread the word.

However, we were appalled by the irregularities present in Chinatown, which we strongly believe compromised the rights of those voters to privacy and to equal access. We write this letter after receiving the complaints of many voters who felt that their privacy and ability to make their own choice was compromised as well as those who witnessed such infringements on the rights of others.

Our complaints are as follows:
   1) <u>Inadequate translations and bilingual election staff</u> – At a polling place such as the Quincy School or the Franklin Institute, where a disproportionate number of the voters is Chinese-speaking, there is a need for increased bilingual capacity. We recognize that at least one bilingual staff was present at both of these sites but believe it was insufficient. Signage was not visible in Chinese and, in the case of the Franklin Institute, volunteer poll-checkers who were not working for the Election Department were repeatedly asked to fill in as translators to assist the voters in checking in. While the volunteers may have been happy and willing to help, this is a situation which needs to be rectified for the future. Chinese language voter registration forms should also be made available for those who arrive unregistered.

   2) <u>Potentially registered voters turned away</u> – Our understanding is that voters who believe themselves to be registered but do not appear on the list should be offered an escrow ballot, which will be kept in escrow until such time as the voter's registration can be verified. Instead, voters were routinely turned away and instead asked to complete a new voter registration card in order to vote in the final election. Re-registration is a good safeguard, but we believe that some 17 individuals at the Quincy School who may have had the right to vote were turned away.

   3) <u>Lack of privacy in the voting booth</u> – While the four-sided voting booths provide for privacy between voters, there is no curtain to provide privacy to the voter from the election staff or translators who hover nearby in order to help those in need. At the Quincy School in Ward 3 Precinct 8, this led to a situation where election officers and translators approached voters who may have been taking their time to decipher the ballot without being clearly asked for help by the voter. This was particularly the case with elderly immigrant voters, who were then placed in the position of needing to refuse the help of the pollworker if it was unwanted.

   4) <u>Improper interference by election workers</u> – Numerous Chinese-speaking elderly voters reported that their ballots were taken and filled out for them, in many cases without asking for their permission or input as to whom they (the voters) would like to choose. Voters who completed their own ballots were told to vote for two candidates, #6 and #10, by pollworkers. One man reported that the

為正義，民主和平等努力                                    *for justice, democracy and equality*

pollworker took his ballot and started to fill in ovals. When the voter said, "I want to vote for #11," the pollworker said, "No, #11's no good. You should vote 6 and 10." The pollworker then completed the ballot for the voter and inserted it into the scanning machine! Such outright campaigning and attempts to influence the vote are clearly way out of bounds for an employee of the Election Department.

We urge the Election Department to investigate these incidents and to immediately take steps to correct the situation prior to the final election on November 4. Steps which would demonstrate a good faith rectification would include:

      1) posting of multilingual information at the polling place
      2) hiring and assignment of new bilingual election workers
      3) steps taken to ensure privacy in the voting booth
      4) clarification and correction of the policy toward unlisted voters
      5) retraining and orientation of all election workers as to proper and improper conduct
      6) no rehire of election workers involved in the above incidents

Thank you in advance for your attention to this serious matter and for your work to improve voter access in the City of Boston.

Sincerely,

Lydia M. Lowe
Executive Director

cc:    William F. Galvin, Secretary of State
       George Pillsbury, MassVOTE
       Glenn Magpantay, Asian American Legal Defense and Education Fund

# EXHIBIT B

**Letter of October 14, 2003 (with enclosure attached)**
From:  Lydia Lowe, Executive Director of the Chinese Progressive Association (CPA)
To:      Nancy Lo, Election Commissioner for the City of Boston
Re:      2003 Municipal Preliminary Election

 華人前進會
*Chinese Progressive Association*
*33 Harrison Avenue, 3rd Floor, Boston, MA 02111*
*Tel: (617) 357-4499 Fax: (617) 357-9611 www.cpaboston.org*

October 14, 2003

Nancy Lo
Election Commissioner
One City Hall Plaza
Boston, MA 02201

Dear Commissioner Lo:

I have just received your letter of October 7 requesting further particulars about our allegations of voting irregularities in Ward 3, Precinct 8, during the September 23, 2003 Preliminary Election. I am glad you agree that these are extremely serious matters which warrant a complete investigation.

In response to your request about potentially registered voters who were turned away at the Quincy School but given a voter registration form, I am enclosing a list of those voters' names and addresses as taken down by our poll checkers during that day. None of these voters, whom I assume were not aware of the escrow ballot provision, have come forward as "complainants." Rather, it is a question which I myself raised, both before the election at the Office of New Bostonians voter education session and during the preliminary election to election workers at the Franklin Institute, about whether those individuals who believed themselves to be registered should be given an escrow ballot in addition to the voter registration form. I would appreciate a clarification of this policy so that we can inform new voters correctly of their rights and the voting procedures within our voter education workshops.

The most serious question which our organization hopes will be investigated and corrected is that of election workers attempting to influence the vote. While I understand that you want some evidence that individual voters did in fact register these complaints, dozens of voters who have described these incidents to us have simultaneously expressed their fear of reprisal should their identities be revealed. Therefore, we have asked some of the most willing voter complainants to create duplicate signed affadavits, one including name and address and the other in the name of John/Jane Doe, which we are simultaneously submitting to the Secretary of State's office with the voters' request that their true identities not be revealed to the Boston Election Department or any of its employees. Being a member of the Chinese community yourself, I am sure you understand that oftentimes the closely interconnected relationships of community members can lead to fears and worries, particularly among immigrant elders.

I hope that your office and the Secretary of State's office can work together to investigate these incidents and those responsible. In the meantime, given the closeness of the November 4 election, I and others would urge you to take proactive measures to preserve the integrity of the vote and of the Ward 3 Precinct 8 polling station by rotating all of the election workers and hiring or assigning new bilingual election workers to that site.

An issue which requires no specific investigation but which is closely connected to the question of voter interference is the problem of the voters' lack of privacy in the voting booth, which provides a greater opportunity for abuse. Finally, posting and providing bilingual materials, in the future even a bilingual ballot, would go a long way toward preventing victimization of voters. We urge you to take swift measures to address some of these more general concerns so as not to have a repeat of these problems in the November 4 election.

Sincerely,

Lydia M. Lowe
Executive Director

cc: William F. Galvin, Secretary of State
    Hon. Chuck Turner
    Chi Chi Wu
    Ila Cooper
    Kerry Costello

為正義，民主和平等努力    *for justice, democracy and equality*

LIST OF NEWLY REGISTERED AND RE-REGISTERED VOTERS

Below are the names and addresses of Boston residents, written down by poll checkers from the Chinese Progressive Association as best as they could, who came to vote at Ward 3 Precinct 8 on September 23, 2003, but found that their names were not on the list. Some of these individuals believed that they had registered, but were asked to re-register without receiving an escrow ballot. Some other individuals realized that they had not registered and were given a voter registration form.

Lee, Tuey Wah
230 Harrison Ave. #A1104

McCarthy, Dennis J.
60 Harvard Street

Chan, Yung Chu
10 Maple Place #5G

Chu, Jerry Butkwan
230 Harrison Avenue

Tse, Kit Fun
888 Washington Stret #405

Chau, Bik A.
230 Harrison Ave. #803

Chen, Pei Chang
5 Oak Street West #904

Wong, Yue Siu
230 Harrison Ave. #D905

Mui, Chu Ngan
5 Oak Street West #807

Chao, Fang
230 Harrison Ave. #B706

Li, Zhong
15 Oxford Street #605

Dwelley, Robert
94 Tyler Street

Eng, Mai
230 Harrison Ave. #701

Roger, Alexander Eli
151 Tremont Street

# EXHIBIT C

**Letter of October 14, 2003**
From: Lydia Lowe, Executive Director of the Chinese Progressive Association (CPA)
To:    Michelle Tassinari, Legal Counsel for the Massachusetts Secretary of State
Re:    2003 Municipal Preliminary Election



華人前進會
*Chinese Progressive Association*
*33 Harrison Avenue, 3rd Floor, Boston, MA 02111*
*Tel: (617) 357-4499 Fax: (617) 357-9611  www.cpaboston.org*

October 14, 2003

Michelle Tassinari
Legal Counsel
Office of the Secretary of State
One Ashburton Place
Boston, MA 02108

Dear Ms. Tassinari:

I am writing on behalf of the Chinese Progressive Association to formally register a complaint with the Secretary of State's office regarding voting irregularities at the Josiah Quincy School polling station in Ward 3 Precinct 8 of Boston during the preliminary election on September 23. A similar letter went out to the Boston Election Department on September 25, along with our request that the situation be rectified in time for the final election on November 4.

On October 10, I received a letter of response from Boston Election Commissioner Nancy Lo requesting the identities of complainants as well as of the poll workers involved in the incidents. However, all of the voters that have described these incidents to our staff have specifically asked us not to reveal their identities to the Boston Election Department or any of its staff, whom are widely perceived to be closely connected to powerful leaders, employers, landlords, and service providers in the Chinese community.

I have therefore responded to Commissioner Lo's request by providing her with a list of the unlisted voters who were asked to re-register, but have explained to her that we are seeking an alternative method to verify to her satisfaction that actual voters did in fact register these complaints. Since receiving her request, we have asked some of the most willing complainants to create duplicate signed affidavits, one including name and address and the other in the name of John or Jane Doe, to submit to the Secretary of State's office with our request that the true identities not be revealed to the Boston Election Department or any of its employees. We do have one affidavit from a member of our staff who is not afraid to share her identity or statement with the Boston Election Department.

We believe that the rights of many Chinatown voters to privacy and to equal access were compromised, particularly those of the elderly and limited English-speaking. The complaints which we have either observed or heard from voters are as follows:

為正義，民主和平等努力                              *for justice, democracy and equality*

1) <u>Inadequate translations and bilingual election staff</u> – At a polling place such as the Quincy School or the Franklin Institute, where a disproportionate number of the voters is Chinese-speaking, there is a need for increased bilingual capacity. We recognize that at least one bilingual staff was present at both of these sites but believe it was insufficient. Signage was not visible in Chinese and, in the case of the Franklin Institute, volunteer poll-checkers who were not working for the Election Department were repeatedly asked to fill in as translators to assist the voters in checking in. While the volunteers may have been happy and willing to help, this is a situation which needs to be rectified for the future. Chinese language voter registration forms should also be made available for those who arrive unregistered.

2) <u>Potentially registered voters turned away</u> – Our understanding is that voters who believe themselves to be registered but do not appear on the list should be offered an escrow ballot, which will be kept in escrow until such time as the voter's registration can be verified. Instead, voters were routinely turned away and instead asked to complete a new voter registration card in order to vote in the final election. Re-registration is a good safeguard, but we believe that some 14 individuals at the Quincy School who may have had the right to vote were turned away.

3) <u>Lack of privacy in the voting booth</u> – While the four-sided voting booths provide for privacy between voters, there is no curtain to provide privacy to the voter from the election staff or translators who hover nearby in order to help those in need. At the Quincy School in Ward 3 Precinct 8, this led to a situation where election officers and translators approached voters who may have been taking their time to decipher the ballot without being clearly asked for help by the voter. This was particularly the case with elderly immigrant voters, who were then placed in the position of needing to refuse the help of the pollworker if it was unwanted.

4) <u>Improper interference by election workers</u> – Numerous Chinese-speaking elderly voters reported that their ballots were taken and filled out for them, in many cases without asking for their permission or input as to whom they (the voters) would like to choose. Voters who completed their own ballots were told to vote for two candidates, #6 and #10, by pollworkers. One man reported that the pollworker took his ballot and started to fill in ovals. When the voter said, "I want to vote for #6, #10, and #11," the pollworker said, "No, #11's no good. You should vote 6 and 10." The pollworker then completed the ballot for the voter and inserted it into the scanning machine! Such outright campaigning and attempts to influence the vote are clearly way out of bounds for an employee of the Election Department.

We believe that steps should be taken immediately, even as an investigation of specific incidents is in progress, to ensure the integrity of the voting process in the Chinatown precincts, and particularly the Quincy School site. We believe that steps which would demonstrate a good faith rectification would include:
1) posting of multilingual information at the polling place
2) hiring and assignment of new bilingual election workers
3) steps taken to ensure privacy in the voting booth
4) clarification and correction of the policy toward unlisted voters
5) retraining and orientation of all election workers as to proper and improper conduct
6) dismissal of election workers involved in improper incidents

We hope that your office will investigate these incidents and, just as importantly, work with the Boston Election Department to ensure that proactive measures are taken to ensure voters' rights during the November 4 election. I will contact you shortly to learn how we can cooperate with the Secretary of State's office to facilitate this investigation. Thank you.

Sincerely,

Lydia M. Lowe
Executive Director

cc:    Nancy Lo
       Hon. Chuck Turner
       Chi Chi Wu
       Ila Cooper
       Kerry Costello

# EXHIBIT D

**Letter of November 17, 2003**
From:  Lydia Lowe, Executive Director of the Chinese Progressive Association (CPA)
To:     Michelle Tassinari, Legal Counsel for the Massachusetts Secretary of State
Re:     City of Boston's Implementation of the Secretary of State's Recommendations



華人前進會
*Chinese Progressive Association*
*33 Harrison Avenue, 3rd Floor, Boston, MA 02111*
*Tel: (617) 357-4499 Fax: (617) 357-9611  www.cpaboston.org*

November 17, 2003

Michelle Tassinari
Counsel, Elections Division
Office of the Secretary of the Commonwealth
One Ashburton Place
Boston, MA 02108

Dear Ms. Tassinari:

Now that the election is past, I want to thank you and Secretary Galvin for your recommendations to the City of Boston, designed to ensure the integrity of the polls in Chinatown and citywide during the November 4 election. Your rapid response to our concerns and the recommendations made to the Boston Election Commission were important to the community.

I am happy to report that there was a marked improvement in the situation at the Josiah Quincy School polling station (Ward 3 Precinct 8). However, we believe that these improvements came under the pressure of the public eye and that the Boston Election Commission's rectification efforts were highly unsatisfactory. This leaves us with a continuing concern about how voters' rights will be protected in the upcoming presidential elections next year.

As I had understood from our telephone conversations, a number of important recommendations were made to the City of Boston by the Secretary which were applicable to Chinatown. These included:
    1) multilingual signage with balloting instructions as well as information about voters' rights
    2) reorganizing of the physical setup of the polling place to allow for increased voter privacy
    3) name tags to identify the roles of election workers and observers within the polling site
    4) rotating election workers responsible for the polls during the preliminary election and hiring new bilingual election workers, with the warden as the key to setting a new tone
    5) training or retraining of election workers with more emphasis on voter privacy

The first three recommendations, those involving signage and physical setup, were implemented as suggested. But the most important recommendations regarding election personnel were not implemented.

New election workers hired at the Quincy School and at the Franklin Institute (the two Chinatown polling places) were given no training whatsoever. When these new election workers asked if they needed training, they were told to "just show up and do what the warden says." The City's explanation that translators do not need training and are never trained fails to give serious weight to the importance of training all election workers. In fact, the translators may be the ones who require training the most, as they are the ones who most directly interact with voters needing assistance.

Several times it was emphasized that the warden is the most important person to set the proper tone for the polling place. Yet the same warden for Ward 3 Precinct 8, who allowed campaign workers to freely roam the polling place instructing elderly voters whom to select, was kept in place for the November 4 election. Observers from the Chinese Progressive Association posted inside the Quincy School polling place all day noted that campaign workers still walked in and out of the polls on November 4. The difference this time was that when a Flaherty campaigner started to sit down at the check-in table with the election workers as they did throughout the preliminary election, the election workers looked at the CPA observers and said in Chinese to the campaigner, "They're watching you!" In fact, it was our physical presence at the polls all day and the watchful eyes of the media—not any serious effort on the part of the Boston Election Commission--that kept the outright campaigning inside the polls in check.

為正義，民主和平等努力         *for justice, democracy and equality*

At the Franklin Institute, both observers and voters noted that a female Chinese bilingual election worker often asked leading questions of the voters. Several times she was heard saying to Chinese-speaking voters in Chinese, "Do you want to vote for 1, 2, and 4?" It is unclear whether she was simply making an assumption or deliberately attempting to lead the voters, but in any case such "naming" of particular candidates is clearly improper behavior for an election worker. I personally had made just such a complaint about this same election worker to the warden at the Franklin Institute when I witnessed similar behavior during the September preliminary election. Here again, no corrective action appears to have been taken.

We are notifying you at this late date because we ourselves only became aware of such incidents in recent conversations with voters and new election workers. It is important to understand that many voters are still unaware of what is considered proper and improper behavior by election workers. We have heard of complaints from voters in other precincts that election workers told them they must vote for four candidates.

I will be in touch with you shortly to see how I and the Chinese Progressive Association can continue to work with you and others to ensure the integrity of the polls for the long term. We are particularly interested in urging that the City of Boston provide bilingual ballots to the nine largest linguistic minority groups, as is done with notices from the Boston School Department. Bilingual ballots and/or ballots with photographs of the candidates (as is done in some other countries) would help to increase voters' independence and decrease the chances of the type of voter coercion that we have seen so often in Chinatown. Thank you again for your attention to these important issues.

Sincerely,

Lydia M. Lowe
Executive Director

cc:    George Pillsbury, MassVOTE
       Glenn Magpantay, Asian American Legal Defense and Education Fund
       Hon. Felix Arroyo
       Hon. Chuck Turner
       Chi Chi Wu, Asian Pacific American Agenda Coalition
       Kerry Costello, League of Women Voters of Boston