IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11598 WGY |
| | ) | <u>THREE-JUDGE COURT</u> |
| CITY OF BOSTON, | ) | |
| MASSACHUSETTS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>UNITED STATES' SUPPLEMENTAL BRIEF AND OPPOSITION TO MOTION FOR CERTIFICATION</u>

This United States has moved for a clarification so that a proven and effective Agreement to remedy serious violations of the Voting Rights Act can continue. The parties to this action specifically agreed that the entire ballot, including candidate names, should be bilingual in English and Chinese so that Chinese-speaking voters would be able to participate equally in the election process. The Secretary was aware of this aspect of the Agreement when implementing legislation was passed by the Massachusetts Legislature. That legislation called for bilingual ballots and made no exception for candidate names. The partial remedies that were implemented did not remedy the voting rights violations. These recurred.[1] The facts before the Court amply demonstrate that relief in the form of transliteration of candidate names was necessary and appropriate, that it has been implemented in a professional manner, that it has proven effective, and that in the absence of transliteration the violations of Chinese voters' rights will recur. The

---

[1] Such violations did not recur when the City used fully bilingual ballots - with transliterated names - in the latest City elections. The United States seeks to maintain this effective system of relief so as to avoid a reversion to violations of the Voting Rights Act.

record before the Court provides ample basis for the requested clarification.  If an additional

factual development was necessary, moreover, it properly would take place before this Court.

## I.     TRANSLITERATION WAS CONTEMPLATED PRIOR TO THE ENACTMENT OF CHAPTER 111

The Secretary has represented to this Court that the first time he was aware that

transliteration of candidates' names was envisioned by the City or the United States was shortly

before the April 17, 2007 municipal elections.  See Docket #95, Answer and Counterclaim at 13,

¶25.  See also  #78-5, Proposed Answer and Counterclaim at 13, ¶ 25; and Docket #79 (Secretary

citing May 21, 2007 letter and May 23, 2007 request from the United States to support statement

that "the question of transliteration arose very recently").  In fact, the evidence before the Court

establishes that the Secretary knew this throughout 2006 and at least five months before the

Legislature passed House Bill 4942, Chapter 111 ("Chapter 111").  Evidence that the Secretary

was on notice includes:  (i) January 5, 2006 letter from Asian American Legal Defense and

Education Fund ("AALDEF") to the City of Boston and copied to the Secretary's Election

Division reciting that transliteration was required under the Agreement, see Letter from Glenn

Magpantay to Gerry Cuddyer and copied to Michelle Tassinari, dated January 5, 2006 (attached

herein as "Ex. A"); (ii) conversations between the City and the Secretary's office concerning

transliteration with regard to the Agreement prior to June 30, 2006, see Docket #87 Ex. A at ¶

14; (iii) meeting between the City and the Secretary concerning transliteration on June 30, 2006,

see id. at ¶¶ 13-14; (iv) email exchange between the City and the Secretary on August 7, 2006,

see id. at ¶ 18; and (v) a letter from Glenn Magpantay on October 10, 2006 telling the Secretary

that the United States had assured him that transliteration was part of the Agreement.  See

Docket #96 at Ex. C.  It therefore is doubly significant that despite this notice, Chapter 111 includes no carve-out or exception for candidate names:  the statute repeatedly provides for "bilingual ballots" and includes no indication that any part of the ballot should not be bilingual.

On the record before this Court, the Secretary failed to communicate to the Legislature, or any other entity, any concerns he may have had regarding transliteration prior to the passage of Chapter 111.  The Secretary, however, has chosen this late date to insert himself into the Agreement and to change its original terms and the terms of implementing legislation, all to the severe detriment of minority voters in Boston.

The Secretary's opposition is all the more puzzling in that his office already transliterates ballot information.  Docket #87, Ex. B at 3-4, ¶ 13.  This extends not just to written ballot terms, such as Massachusetts, Suffolk and Middlesex, but to candidate names.  The Secretary has provided, and has represented to the Court that he will continue to provide, candidate names in the Chinese version of the audio function on the accessible voting machines.  In fact, such names are not sight-read directly from the English, but are first transliterated so as to be compatible with the Chinese voters' understanding.  The Chinese version of the ballot, including transliterated names, is then read to produce the Chinese audio version.  Decl. of Helen Wong at ¶¶ 4-8 dated July 31, 2007 (attached herein as "Ex. B").   This was the process used by the State for the April and May 2007 special municipal elections.  Id.  It is, moreover, an essential process to make the audio ballot comprehensible to voters due to the many differences between the Chinese and English languages, including sounds present in English that are not present in Chinese and tonality present in Chinese not found in English.  Decl. of Tobie Meyer-Fong at ¶¶ 2-4, dated July 31, 2007 (attached herein as "Ex. C").

- 3 -

## II.     THE AGREEMENT ACHIEVES THE OBJECTIVES OF FEDERAL LAW[2]

Here, the Agreement was modified by this Court, this Court retained control over any

changes to the Agreement, and this Court also retained jurisdiction, including for the resolution

of disputes.[3]  Upon its adoption by a court, a private agreement between parties becomes a

judicially enforceable consent decree.  Feliciano v. Rullan, 378 F.3d 42, 58 (1st Cir. 2004)(citing

Frew ex rel. Frew v. Hawkins, 540 U.S. 431 (2004)).  Although entry of a consent decree does

not constitute a finding of fact or ruling of law, it is a determination of probability of success on

the merits.  Culbreath v. Dukakis, 630 F.2d 15, 23 (1st Cir 1980).  "Consent decrees entered in

federal court must be directed to protecting a federal interest."  Frew, 540 U.S. at 437.  Such

decrees "must spring from, and serve to resolve, a dispute within the court's subject-matter

jurisdiction; come within the general scope of the case made by the pleadings; and must further

the objectives of the law upon which the complaint was based."  Id.

In Frew, a unanimous Court ruled that federal courts can enforce extra-statutory terms of

consent decrees arising from suits against state officials without first finding a violation of

federal law.  Frew, 540 U.S. at 438-39 (discussing Firefighters v. Cleveland, 478 U.S. 501

(1986).  Provided the decree at issue is a federal-court order that springs from a federal dispute

---

[2]  For the purposes of Part II, the United States assumes that the Court is concerned with a possible conflict between the Agreement's requirements and state law.  Without such concern, Eleventh Amendment discussion is not applicable to the instant proceedings.  The United States denies all arguments of the Secretary that transliteration was not part of the remedial provisions of the Agreement or, as discussed *infra* Parts III and IV, that it is not authorized under Chapter 111.

[3]  Under these circumstances, the United States has filed the instant Motion for Clarification with the full Court.  Any litigation of the Section 2 claim necessitated by acceptance of the Secretary's position would be before a single judge.

and furthers the objectives of federal law, enforcement of the agreement, or the remedies
provided therein, does not violate the Eleventh Amendment.  Id.  Texas officials in Frew
challenged the district court's ability to enforce the provisions of a consent decree requiring the
state to provide specific services beyond that required by federal law absent a finding a federal
violation.  Id. at 435-36.  Rejecting this claim, the Court held that "[f]ederal courts are not
reduced to approving consent decrees and hoping for compliance."  Id. at 440.

     This Court accordingly does not need to find that the City violated the Voting Rights Act
in order to enforce the terms of the Agreement under Frew.  The complaint filed by the United
States that led to the consent decree involved serious violations of the Voting Rights Act, and the
remedies set forth in the Agreement were negotiated and narrowly tailored to resolve specific
violations of Chinese-speaking voters' rights:  the mis-marking of their ballots.  These violations
were directly related to the voters' inability to read candidate names and vote independently and
privately.  The fully bilingual ballot requirement, including candidate names, was and is
necessary to ensure equal access to the franchise for Chinese-speaking voters.  The failure to
provide a fully bilingual ballot will severely impede, indeed thwart, the federal objectives upon
which the original complaint was based.  Id. at 437.

     The Supreme Court similarly held in Lawyer v. Dep't of Justice, 521 U.S. 567 (1997),
that it is not necessary to find a constitutional violation before entering a consent decree
significantly changing and over-riding state law.  Lawyer v. Dep't of Justice, 521 U.S. at 578-79.
The appellant in Lawyer argued that the district court's failure to formally adjudicate the State's
redistricting plan and find it unconstitutional before it approved the parties' settlement
improperly denied state authorities the opportunity to devise a new redistricting plan.  Id. at 576.

Rejecting the appellants argument, the Court noted that a "judicial decree is not the end but the means." Id. at 579. The Court granted the relief without the formality of an adjudication. Id.

Although the Supreme Court ruled in Frew and Lawyer that a formal adjudication is not necessary before ordering a remedy that furthers the objectives of federal law, the United States certainly recognizes that the courts do not have plenary power to change state laws. The instant case, however, is clearly distinguishable from those decisions blocking enforcement of agreements. One such example is Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs, 142 F.3d 468 (D.C. Cir.1998), where a trial court approved a consent decree negotiated by the leaders of a minority group and the county board of commissioners. The agreement ordered a completely new election system for selecting members to the county board of commissioners and violated explicit procedural state law mandates. Id. at 470. Because that agreement also contained an unqualified disclaimer by the defendant-county that no liability could be inferred from the entry of the consent decree, the court found that a violation of the Voting Rights Act could not be presumed, and that the unqualified disclaimer confined the court's authority to the boundaries of state law. Id. at 478. The court noted that if a violation of federal law necessitates a remedy directly *barred* by state law, the state law must give way. Id. at 477 (emphasis added).

That is not the case here. The instant Agreement has no disclaimer, unqualified or otherwise, regarding the City's liability. The City of Boston disputed the alleged violations of federal law and committed its resources to improving the administration of elections and ensuring equal access to all the city's voters, especially those minority groups that were the victims to the violations described in the United States' complaint, but at the same time, the City

specifically agreed that the transliteration of candidate names was "necessary and appropriate under all of the circumstances." See Agreement, Docket 60-2, page 3-4. Here, moreover, the record contains a wealth of unrefuted evidence of federal law violations. See generally United States' Response to Opposition to the Unopposed Motion to Clarify, Docket #87 filed on July 23, 2007. Accordingly, there is sufficient evidence in the record for this Court to find that transliteration is, as the parties stipulated, a necessary remedy such that it should continue despite the Secretary's claims.

Second, unlike Cleveland County, no party before this Court argues that the instant consent decree actually violates state law. No statute specifically prohibits transliteration. Instead, the Secretary claims that transliteration of candidate names are not authorized by state law.[4] In Cleveland County, the consent decree effectuated a complete change in government structure and election procedures.[5] No such sweeping changes or violations to state law are before the Court. Federalism concerns do not arise until there is a direct conflict between state and federal law. Brooks v. State Bd. Of Elections, 848 F.Supp. 1548, 1563 (S.D. Ga. 1994)(finding, inter alia, that the Supremacy Clause does not operate until a *direct* conflict between state law and federal law is shown)(emphasis in original). The instant case is distinguishable from Cleveland County.

---

[4] As addressed *infra* Part III, the United States maintains that transliteration is authorized and provided for under Chapter 111. This is the only relevant state law before the court.

[5] Specifically, that consent decree increased the number of commissioners from the five allowed under state law, to seven; overhauled the election methodology; changed the commissioners' terms of office; and provided the minority association, which initiated the original suit leading to the decree, the right to review and object to the two new commissioners that were to be appointed to represent the minority to community - in essence a racial set-aside. Id. at 470-471.

Third, the instant case is brought by the Attorney General of the United States. This Circuit has held that "courts are required to give some deference to the Attorney General that the settlement is appropriate." United States v. Charter Intern. Oil Co., 83 F.3d 510, 520 (1st Cir. 1996). Here, the Agreement reflects long-standing Department policies, see Deval Patrick Letter, Docket #82 attachment #1; moreover, as noted above, the parties stipulate in paragraph 2 of the Agreement, the paragraph that prompted Chapter 111, that transliteration is "necessary and appropriate under all of the circumstances." The Agreement thus reflects the Attorney General's enforcement decision to give due consideration to the sensitivities of local governments and to effect the governmental interest in a cooperative stance with such entities going forward. These facts, combined with total absence of a disclaimer on the part of the City, and the fact that no party argues that remedial provisions of the consent decree actually violate state law, provide this Court an adequate basis to determine that it need not formally find that there has been a violation of federal law to allow Chinese ballots to continue to provide transliterated candidate names. See Perkins v. City of Chicago Heights, 47 F.3d 212, 217 (7th Cir. 1995)(modifications to state law cannot be made via a consent decree between parties "unless the court finds that the statutory provisions *would* violate federal law and that such changes are necessary to ensure compliance with federal law.")(emphasis added). Accordingly, an order effectuating the intent of the parties would, under the instant circumstances, be both a necessary and appropriate action of this Court.

## III.    CHAPTER 111 CALLS FOR A FULLY BILINGUAL BALLOT.

The Agreement in this matter was ordered by this Court on October 18, 2005. Nine months after the parties originally agreed to a fully bilingual ballot, including transliteration, the

Legislature duly passed House Bill 4942, Chapter 111.  Chapter 111 was passed solely to effectuate the Agreement.  Sections 1, 2 4, 5, and 6 of Chapter 111 specifically reference that Agreement, and there has been no suggestion that there was any other purpose for the legislation, or that any other purpose or limitation on that purpose ever was communicated to the Legislature.  Contrary to the Secretary's assertions to this Court, he was aware months before Chapter 111 passed that the parties specifically had included bilingual candidate names in the Agreement as part of the remedial system.  <u>See</u> *supra* Part I.  The parties specifically discussed and agreed to transliteration as a part of a fully bilingual ballot.  Decl. of John Tanner at 1-2, ¶ 3 (Ex. D).  The City of Boston promptly researched and started to develop a transliteration process and, pursuant to the Agreement, the City of Boston transliterated candidate names for its latest elections.

Principles of statutory construction, recognized by Massachusetts courts, show that before any court can interpret Chapter 111 and the meaning of "bilingual" contained therein, the original terms of the Agreement must be determined.  First is the fundamental principle that "statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature . . . ."  <u>Commonwealth v. Hatch</u>, 438 Mass. 618, 622 (Mass. 2003); <u>see also</u> <u>Suffolk Constr. Co. v. Div. of Capital Asset Mgmt</u>, 449 Mass. 444, 454-455 (Mass. 2007) ("we begin with the proposition that a statute is construed to fulfil the Legislature's intent, as found most obviously in the words of the law itself, interpreted according to their ordinary and approved usage").  Here, the plain meaning of Chapter 111 indicates a fully bilingual ballot.  "Bilingual" means "having or expressed in two languages."  <u>See</u> Merriam-Webster's Collegiate Dictionary 113 (10th ed. 1999).  The Chapter 111 requirement for a bilingual ballot in Chinese

does not exclude candidates' names from the term bilingual.  A ballot in which candidate names, the essence of the ballot, did not appear in Chinese would not be truly bilingual.

Equally telling, is the stated "aim" of the Legislature.  Chapter 111 specifically and repeatedly references the Agreement between the United States and the City of Boston and states that it is "defined" by the Agreement, and thus evinces an intent on the part of the Legislature to effectuate the intent and agreement of the parties, which intent was a fully bilingual ballot.  This aim, and the plain meaning of the term bilingual points only to an interpretation that would include a fully bilingual ballot with transliteration of candidates' names.

Second, to interpret a statute, a court "ascertain[s] the intent of the legislature, as evidence by the language used, and considering the purposes and remedies intended to be advanced."  Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 98, 502 N.E.2d 1375 (1987); see also Lindsay v. Dep't of Soc. Servs., 439 Mass. 789, 796 (Mass. 2003) (stating that where two readings of a statute are possible, the court will "choose the reading that best comports with the statute's apparent intent and purpose" and the court will "reject a reading that would hobble the statute's effectiveness").  Again, the purpose of Chapter 111 was to provide for a bilingual ballot in Chinese pursuant to the Agreement.  The remedy intended to be advanced by the Legislature was again to provide for the remedies mandated in the Agreement, including remedying the voting rights violations encountered by Chinese-speaking voters at the polls.  See Elise Castelli, "Bill Pushed to Require Boston Ballots in Chinese, Vietnamese," State House News Service, May 30, 2006, attached as Exhibit E to Docket #78-2 (Gerry Cuddyer testifying that the bill would allow Chinese and Vietnamese speakers to "cast his or her vote with the same expectation of privacy we all enjoy," and Chapter 111's chief sponsor Jeff Sanchez stating

"hopefully . . . we make voting accessible to all populations").  These in turn, directly resulted from the voters' inability to independently read the names of the candidates, and their consequent reliance on others.  The intended remedy was to provide for a mechanism by which such voters could understand the candidates for whom they were voting.  Here, reading transliteration out of the term bilingual would not provide the remedy intended by the parties and Chapter 111.  A partially translated ballot is not enough, as shown by the Federal Observer Reports, see Docket # 64, attachment #1 at 27B, 27J, 27M, 27K, 27O, 27R, 27QQ, 27PP, 27FF, 27L, 27UU, 27RR, 27X, 27CC, 27D, 27JJ, 27N, 27II, 27SS, dated September 19; Docket # 65, attachment #19 and #20 at 27D, 27E, dated November 7, 2006; Docket #65, attachment #27 and #28 at 22G, 27D, dated November 7, 2006.  The Commonwealth did not transliterate candidate names in the September and November 2006 elections and Chinese-speaking voters were not able to vote independently, privately, and with certainty even though part of the ballot was bilingual:  the essence of the ballot – candidates' names – was not bilingual, and Chinese-speaking voters could not read that essential information in English.  Such discrimination in access to the franchise did not occur in elections where names were transliterated.  A construction of Chapter 111 that does not include a fully bilingual ballot will not advance the purposes and remedies intended by the Legislature, and will "hobble the statute's effectiveness."

Third, Massachusetts courts will not construe a statute leading to a "determination that a piece of legislation is ineffective" if the statute "is fairly susceptible to a construction that would lead to a logical and sensible result."  Adamowicz v. Ipswich, 395 Mass. 757, 760, 481 N.E.2d 1368 (1985).  Here, again the observer reports show that a construction of Chapter 111 leading to the continuing inability of Chinese voters to read candidates' names would make this piece of

legislation ineffective.  Again, in contrast to the September and November 2006 elections where

the Secretary declined to transliterate candidates' names, the declarations on the record before

this Court show that because the City transliterated the candidates' names in its April and May

2007 elections and complied with the Agreement, Chinese-speaking limited-English proficient

("LEP") voters could vote with privacy, independence, and certainty.  Docket #87 Exs. C, D, E,

G-I, K, L, N, P, Q, S-V, X, Z, AA-AD.  This privacy, independence, and certainty only occurred

after transliteration was actually implemented.  Accordingly, Chapter 111 only reaches true

effectiveness when the ballot is fully bilingual.  Conversely, it is ineffective when candidates'

names do not appear bilingually on the ballot.  See also North Shore Realty Trust v.

Commonwealth, 434 Mass. 109, 112, 747 N.E.2d 107 (2001) ("If a liberal, even if not literally

exact, interpretation of certain words is necessary to accomplish the purpose indicated by the

words as a whole, such interpretation is to be adopted rather than one which will defeat the

purpose."); McCarthy v. Woburn Housing Auth., 341 Mass. 539, 542 (Mass. 1960) ("A

construction of . . . [a statute] that would lead to an absurd and unreasonable conclusion is not to

be adopted where its language is fairly susceptible to a construction that would lead to a logical

and sensible result."); Suffolk Constr. Co. v. Div. of Capital Asset Mgmt., 449 Mass. at 454-455

("We do not overlay the words of a statute with a convention of statutory construction that would

frustrate the general beneficial purposes of the legislation.").

    Moreover, it is the duty of the court to construe statutes so as to avoid constitutional

difficulties when reasonable principles of statutory construction permit.  Bozenhard v. Town of

Shrewsbury, 18 Mass. L. Rep. 141 (Mass. Super. Ct. 2004).  Here, construing Chapter 111 as not

providing for a truly bilingual ballot will result in a conflict with an Agreement entered under

federal law concerning violations of the Voting Rights Act and state law.  Construing Chapter 111 as providing for a truly bilingual ballot will avoid such conflict, and is not only a permissible but a superior reading of the statute.

Finally, although the Secretary avers that, knowing the intent of the parties, he had a separate, private interpretation of the term bilingual as it related to candidates' names, such a separate, private interpretation is insufficient to refute the plain meaning of the term "bilingual," the parties known intent, and the known effectiveness of the remedy.  <u>Boston Water & Sewer Comm'n v. Metro. Dist. Comm'n</u>, 408 Mass. 572, 578, 562 N.E.2d 470 (1990)(finding that Legislature presumed to understand and intend all consequences of its acts).[6]  There is no evidence that the Secretary or the Legislature believed that anything less than a fully bilingual ballot was called for in the Agreement and by Chapter 111.

## IV.    THE QUESTION OF STATE LAW SHOULD NOT BE CERTIFIED.

The Supreme Judicial Court of Massachusetts provides for certification of questions of state law where there exist:  (i) questions of state law which may be determinative of the cause then pending in the certifying court; and (ii) there is no controlling precedent.  ALM Sup. Jud. Ct. Rule 1:03.  Any certification order to the court must include "a statement of all facts relevant

---

[6] The Secretary's stated discomfort regarding the meaning of bilingual has had changing bases, all based on misinformation.  First, the Secretary would not transliterate because the names in Spanish are not transliterated.  Docket #87 Ex. A at ¶ 18.  Spanish is based on a Romanized alphabet and thus Spanish-speaking voters are able to read candidate names.  The Secretary also argued that transliteration could lead to litigation.  Extensive experience across the United States has turned up no such litigation.  Docket #87 Ex. AG at ¶ 3 and Ex. A at ¶ 5.  The Secretary then contended that it would cause confusion with voters.  Docket #79 at 6.  The overwhelming evidence before the Court is that the transliteration done by Boston, through standardization of candidates' names, has avoided confusion and greatly benefitted Chinese-speaking voters.  The Secretary now contends that a fully bilingual ballot is not authorized under the state law that mandates a bilingual ballot.

to the questions certified and showing fully the nature of the controversy in which the questions arose." Id.

"The purpose of certification is to ascertain what the state law is" and, where there is no definitive ruling, courts should consider "analogous decisions, considered dicta, scholarly works and any other reliable data tending convincingly to show how the highest court in this state would decide the matter at hand." Stewart v. Milford-Whitinsville Hosp., 349 F. Supp. 2d 68, 70-71 (D. Mass. 2004). It is not appropriate for a federal court to "use certification when the course the state courts would take is reasonably clear." Id.; see also Limone v. United States, 2007 U.S. Dist. LEXIS 54224 (D. Mass. 2007) ("In fact, if I am able to predict my course, I am bound to.").

Federal District Courts, however, have the authority to predict how state courts would decide an issue, even if state precedent is ambiguous, absent or incomplete. Lorenc v. Be Free, Inc., 136 F. Supp. 2d 1, 4-5 (D. Mass. 2001)(citing New Ponce Shopping Ctr. v. Integrand Assur. Co., 86 F.3d 265, 267 (1st Cir. 1996)). Certification is inappropriate where there are central issues of fact that must be determined in order to answer a state law question. RLI Ins. Co. v. Gen. Star Indem. Co., 997 F. Supp. 140, 143 (D. Mass. 1998)("[O]rdinarily a federal trial court, before considering certification, should take special care [] to resolve all potentially material factual and evaluative questions . . . ."); Lumbermens Mut. Casualty Co. v. Belleville Indus., 407 Mass. 675, 687-688 (Mass. 1990) (declining to answer a question of state law where there were substantial issues of fact yet to be determined); Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 372 (Mass. 1990) ("We add that if, in the future, the questions certified to us . . .

- 14 -

are not accompanied by sufficient nonhypothetical, evidentiary facts to allow us to adequately determine the answers, we may decline to answer such questions").

There are substantial issues of fact that must be resolved by this Court before any court can, and before the Supreme Judicial Court will, interpret Chapter 111. The Agreement was signed in September 2005. Chapter 111 was passed afterwards, in June 2006, as contemplated and required by the Agreement. Because the Agreement came first, was the impetus for the passing of Chapter 111, and because Chapter 111 is defined by the terms of the Agreement, any court must necessarily first determine the terms of the Agreement before it can interpret the terms of Chapter 111. This is not a "what came first" type dispute. It is clear that the Agreement came first, led to the passage of Chapter 111, and defines the terms of Chapter 111.

Accordingly, there are substantial issues of fact concerning the terms of the Agreement, specifically whether the original terms of the Agreement provided for a fully bilingual ballot in Chinese, or whether the original terms of the Agreement excluded the essence of the ballot, candidates' names. The Secretary has put forth "objective indicia" to argue that the original terms of the Agreement did not include transliteration of candidates' names. The United States has provided clear and undisputed evidence that the Agreement provided for transliteration of candidates' names into Chinese resulting in a fully bilingual ballot. Because the terms of the Agreement define the terms of the statute, once a court decides what the original terms of the Agreement were, only then can it determine whether Chapter 111 authorizes the terms of the Agreement by which it is defined. Also, if the plain meaning of the term bilingual and original intent of the parties are not sufficient indicators for the Court's decision, the Court will have to determine as a matter of fact whether candidates' names failing to appear bilingually on a ballot

would make Chapter 111 "ineffective." Thus, even if this Court were to certify the issue whether Chapter 111 authorizes the printing of a fully bilingual ballot, such certification should not happen until after the factual issues have been determined of what the original agreement called for and whether failure to transliterate renders the statute ineffective.

For a court to employ the rules of statutory construction as discussed previously, it must first determine what the "plain meaning" "in light of the aim of the Legislature" was when Chapter 111 was passed. The Legislature's aim points directly to the Agreement and thus again the Agreement must first be defined before the Legislature's aim can be determined. Also, to determine whether Chapter 111 would be an "ineffective" piece of legislation under principles of statutory construction, the court will have to determine whether a ballot that is not bilingual as to its essence – candidates' names – is an effective remedy for Chinese-speaking LEP voters who cannot read the candidates' names in English and have been and are susceptible to being coerced to vote for someone other than their preferred candidate.

Certification to the Supreme Judicial Court would result in the state court deciding federal law issues. If this Court certifies this issue to the Supreme Judicial Court before the original terms of the parties are interpreted, then the Supreme Judicial Court of Massachusetts will either have to deny certification because there are disputed issues of fact upon which the question of state law turns, or the state court will have to interpret the original terms of the Agreement and decide whether a ballot without the names appearing bilingually is an ineffective statute. Such a result would enmesh a state court into deciding federal issues surrounding the Voting Rights Act, and interpreting a federally entered Agreement between two parties surrounding violations of the Voting Rights Act.

- 16 -

The Agreement and statute both, however, are sufficiently clear for this Court to proceed. The Agreement originally provided and has always provided for transliteration of candidates' names. The Agreement for a "bilingual ballot" included a fully bilingual ballot, as was known to the Secretary before the statute was enacted, and the statute contains no exception for candidate names. Because this Court can clearly interpret the straightforward statute, there is no need to certify the issue to the state court.

Finally, the State is printing the ballots for the upcoming September elections on approximately August 13, 2007. Reply briefs are due August 8, 2007. Thus, if the question were certified to the Supreme Judicial Court, such court would have three days to interpret the state law. With extensive fact-finding, the issue could remain unsettled when Chinese-speaking voters go to the polls next March to select nominees for President of the United States. Certification to the Supreme Judicial Court would unnecessarily delay this issue, and delay the restoration of equal access to the franchise for Chinese-speaking voters in Boston.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests the Court to order the requested clarification.

Respectfully submitted,

WAN J. KIM
Assistant Attorney General
Civil Rights Division


 */s/ T. Russell Nobile*
JOHN TANNER
SUSANA LORENZO-GIGUERE
VERONICA SEUNGWON JUNG
T. RUSSELL NOBILE
JARED M. SLADE
jared.slade@usdoj.gov
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 305-4733 (phone)
(202) 307-3961 (fax)

Date:   August 1, 2007

## **CERTIFICATE OF SERVICE**

I, T. Russell Nobile, hereby certify that the foregoing document and proposed order filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 1, 2007.


*/s/ T. Russell Nobile*
T. Russell Nobile
Trial Attorney, Voting Section
United States Department of Justice