## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BOSTON, MASSACHUSETTS, et al.,<br><br>Defendants | Civil Action No. 05-11598 WGY |

## BRIEF FOR THE SECRETARY
## OF THE COMMONWEALTH

The Secretary of the Commonwealth of Massachusetts (Secretary) submits this Brief in response to the Court's request at the hearing on July 25, 2007.

### SUMMARY OF ARGUMENT

1.  There is no reason for the Court to intervene with regard to the imminent special state elections. First, no party has requested such intervention. Second, for several independent reasons, there is little or no likelihood of success on an argument that this Court should construe the state law to mandate that the Secretary transliterate the candidates' names into Chinese characters on the bilingual English-Chinese ballots that he is preparing for those elections. Third, the Secretary is undertaking specific measures to provide extra support for Chinese-American citizens of limited English proficiency who wish to vote in these elections, including providing, and publicizing in Chinese the availability of, extra AutoMARK machines that can assist such voters with audio translations of the ballot, both in Mandarin and in Cantonese. The Court should instead

structure future proceedings to achieve an orderly resolution in time for printing the ballots for the presidential primaries on March 4, 2008 (for which it turns out that the date for providing ballot information to the printer, given their complexity, is December 14, 2007).

2.  The key question to be answered during that time frame is whether or not state law mandates transliteration.  That question is appropriately answered by, and should be certified to, the Supreme Judicial Court of the Commonwealth of Massachusetts.

2A.  The apparent fact that at least two members of this Court, in reviewing and modifying the Settlement Agreement in October 2005, did not understand it to mandate transliteration of the candidates' names into Chinese characters, is relevant and should be useful to the Supreme Judicial Court's consideration of the certified questions.  That understanding as to the meaning of the Settlement Agreement should be conveyed to the Supreme Judicial Court as part of the certification.  Since that determination would not entirely remove the controversy about the meaning of the state law, certification would still be appropriate.

2B.  An unexpressed intention of the parties to the Settlement Agreement to mandate transliteration, even if proven (and none of the many declarations that the United States has submitted actually attests that there was such an agreed-upon intention), would not be relevant to the Legislature's intent in enacting the state law or to Supreme Judicial Court's consideration of the certified questions.  The so-called Motion to Clarify, which actually seeks a modification of the Settlement Agreement, should be summarily denied. In the alternative, its consideration, which could require substantial time and resources of the Court and the parties to no significant end, should at least be deferred.

2C.  Most or all of the declarations and other materials submitted by the United States and by the amici in support of the Motion to Clarify should be stricken, excluded or limited, as they were improperly filed and are not relevant to the motions pending before the Court (or are otherwise inadmissible).  In particular, the statement of relevant facts required for certification should be narrow and limited.  The Secretary is hopeful that these issues will be sorted out in an informal process of preparing that statement, but otherwise it may be necessary for him to move to strike, exclude or otherwise limit consideration of most or all of these materials.  If the Court is planning to establish a schedule, the Secretary requests a window for bringing such a motion and, potentially, for conducting discovery and making a responsive evidentiary submission as appropriate.

3.  The three-judge district court was properly convened in this case, and, having reviewed and approved the Settlement Agreement that the parties submitted to it, is the appropriate court to set forth its understanding of what it was approving at that time.  Although the exact dividing line between the jurisdiction of the three-judge court and that of the single district judge need not be fully delineated at this time, it is common ground that the only claim in the complaint that required a three-judge court was the first cause of action, which was brought under § 203 of the Voting Rights Act only with respect to Hispanic voters; the second cause of action, which was brought under § 2 of the Act and was the only claim in the complaint concerning Chinese-American voters, did not require a three-judge court.  The controversy in this case over whether the Secretary is required to transliterate candidates' names into Chinese characters does not arise under § 203 and does not itself require a three-judge court.  The motion to certify questions of law to the

Supreme Judicial Court as to whether state law mandates such transliteration should be decided by the single district judge.

## ARGUMENT

### I.    THERE IS NO NEED FOR COURT INTERVENTION WITH REGARD TO THIS FALL'S ELECTIONS

The Court should not enter an order affecting this fall's elections, for several independent reasons.

*First,* no party has requested such an order. As to this fall's municipal elections, the City of Boston is planning to prepare and include transliterations of the candidates' names on the ballots, and the Secretary, in the interest of an orderly presentation of the issues in this case, has committed that he will not seek to disrupt those plans at this late date. As to the upcoming special state elections, neither the United States nor the City has brought any motion for an order requiring the transliteration of the candidates' names into Chinese characters on the bilingual ballots that the Secretary is preparing for the Boston precincts involved in those elections that the Memorandum of Agreement and Settlement (Settlement Agreement) designates for the provision of bilingual English and Chinese ballots.

*Second,* the entry of an order mandating such transliterations would require this Court to find that the United States has shown a likelihood of success on the argument that the special state law, Mass. St. 2006, c. 111, mandates that the Secretary prepare and set forth such transliterations on the ballots. *See, e.g., Esso Std. Oil Co. v. Monroig-Zayas,* 445 F.3d 13, 18 (1st Cir. 2006), quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 10-11 (1st Cir. 2004) (setting forth the standard four-part test for preliminary

injunctive relief); *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993) (holding that "[t]he *sine qua non* of that [test] is whether the plaintiffs are likely to succeed on the merits"); *see also Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (same, with respect to the same four-part standard applied to motions for a stay pending appeal). But that argument is *not* likely of success, for several independent reasons. First, it is based upon the proposition that the Legislature adopted the meaning expressed in the Settlement Agreement, but two members of this Court observed at last week's hearing that when they reviewed, modified and approved the Settlement Agreement they did not understand it to mandate transliteration. *See* Transcript of Hearing (July 25, 2007), at 13 (Saris, J.) ("if this was your intent, none of us knew it."); *id* at 17 (Lynch, J.) ("I did not understand, as Judge Saris said, that that was what we were approving . . . [T]hat was not what I understood when I approved this order."). Alternatively, it is based upon the assertion that the United States and the City of Boston had a private agreement that the Settlement Agreement would mandate transliteration. That assertion is problematic for three separate reasons: (1) none of the several dozen affidavits that the United States has submitted supports the assertion; (2) according to a statement made at last week's hearing, it was the Court's objective, when it modified the Settlement Agreement, to preclude private agreements not apparent to the public, *see id.* at 29-30; and (3) even if there was a private agreement as alleged, there is no basis for concluding that the Massachusetts Legislature, in enacting the special state law, was aware of that agreement or that it understood or intended that the special state law would mandate transliteration. Finally, and perhaps even more fundamentally, for this Court to order the Secretary to transliterate the candidates' names on the impending ballots would fly in the face of the

legitimate concerns about federalism that the Court expressed at the hearing.  *See, e.g.,*
*Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors
of state law [and] we are bound by their constructions except in extreme circumstances");
*Wainwright v. Goode,* 464 U.S. 78, 84 (1983) (per curiam) ("[T]he views of the State's
highest court with respect to state law are binding on the federal courts"); *Ring v.*
*Arizona,* 536 U.S. 584, 603 (2002) (recognizing the Arizona Supreme Court's
construction of Arizona sentencing law as authoritative).

    **Third,** the Secretary is undertaking special measures to provide extra support to
limited-English proficient Chinese voting age citizens who wish to vote in the upcoming
state elections this fall.  Each of these is a special election to fill only one position – in
one case, a vacant state senate seat; in the other case, a vacant state representative seat.
The special senate election[1] involves only 66 precincts (spread across three counties),
eight of which are precincts for which the Settlement Agreement requires bilingual
ballots in English and Chinese.  The special state representative election[2] involves only
14 precincts, in one of which the Settlement Agreement requires such bilingual ballots.
The fact that they are special elections makes it more practicable to focus extra resources
on relatively short notice in order to add to the procedures already in place that assist
limited English proficient Chinese-American citizens who wish to vote in these elections.
Moreover, it appears that each of the affected precincts contains a relatively low
concentration of Chinese-American registered voters (i.e., barely above the threshold

---

[1]  The primary election for this vacant Senate seat is scheduled for September 11, 2007;
the general election is scheduled for October 9, 2007.

[2]  The primary election for this vacant Representative seat is scheduled for September 25,
2007; the general election is scheduled for October 23, 2007.

number (35) that triggers the minimum requirements for bilingual ballots and election officials under the Settlement Agreement), which, if anything, increases the likelihood that these measures (in addition to the bilingual ballots) will be effective should any Chinese-American voters be in need of such assistance.

Specifically, the Secretary has already delivered AutoMARK Voter Assist Terminals, which provide assistance to disabled voters, for all of the precincts in which the special elections will be held. These machines have an audio component that can assist voters who could benefit from such a feature, including those who have a limited ability to read the English language. The Secretary will also provide *extra* AutoMARK machines for each of the nine affected precincts to guard against any possibility that the original machines will not be able to meet the demand.[3] Moreover, the Secretary has secured a commitment from the vendor of the machines to provide audio translations both in Mandarin and in Cantonese for these elections.

The Secretary also will place ads in Chinese language newspapers circulated in Boston publicizing the availability of this audio capability to assist limited English proficient Chinese-American voters. The Secretary will also provide polling-place signs

---

[3] The additional AutoMARK machines can serve as a backup in case any of the machines already supplied for these precincts encounters mechanical difficulties. They could also, in response to concerns that the Department of Justice has raised, be used in the event that lines were to build up for the machines. However, it is very unlikely that such lines would develop in these particular elections, both because turnout in special elections typically is very low and because, since there is only one election contest on each occasion, it typically should not take an extended period of time for users of the audio assistance to cast their ballots.

in Chinese, as well as in English, advertising the availability of the audio machines for

Chinese-American voters who have limited proficiency in English.[4]

Moreover, the Secretary hereby undertakes to submit a report to the Court on his

progress with respect to these initiatives, on or about August 24, 2007.

There is, thus, no reasonable basis or need for this Court to enter an order

mandating transliteration of candidates' names into Chinese characters on any of the

bilingual ballots in this fall's elections.  The Secretary submits that it is reasonable and

appropriate instead to structure these proceedings in an orderly manner that will permit a

resolution of the pending controversy in time for the Presidential Primary Elections,

which are scheduled to take place on March 4, 2008 (and for which the scheduled time

for providing ballots to the printer turns out to be December 14, 2007).[5]

## II.    THE QUESTION OF WHETHER STATE LAW MANDATES
TRANSLITERATION SHOULD PROMPTLY BE CERTIFIED
TO THE SUPREME JUDICIAL COURT

The key question to be answered during that time frame is whether or not state

law mandates transliteration.  That question is appropriately answered by, and should be

---

[4] The Secretary also proposed to prepare fliers in Chinese and English with photographs
of the candidates next to their names (in English, not transliterated to Chinese characters).
Photographs actually were suggested by the Chinese Progressive Association (*see* Letter
from Lydia M. Lowe, Executive Director, to Michelle Tassinari dated November 17,
2003, Docket No. 87-3 at p. 26), but the United States has affirmatively objected to this
proposal on the ground that the use of photographs in elections is prone to racial appeals.
Although the Secretary does not share the Justice Department's view that this approach
could have racially discriminatory effects, under the circumstances the Secretary remains
willing to follow through with this proposal, but only pursuant to a written agreement of
the United States or an Order of this Court.

[5] The undersigned apologies for providing an inaccurate answer to the Court's question at
last week's hearing regarding the necessary lead time for providing ballot information to
the printer.  It turns out that preparing the ballots for the Presidential Primary Elections is
an unusually complex task.

certified to, the Supreme Judicial Court of the Commonwealth of Massachusetts.  *See* cases cited at pp. 5-6, above.

### A.    This Court's Understanding That The Settlement Agreement Does Not Mandate Transliteration Is Relevant

As noted in Argument I, above, two members of the Court observed at last week's hearing that when they reviewed, modified and approved the Settlement Agreement in October 2005, they did not understand it to mandate transliteration.  *See* Transcript of Hearing (July 25, 2007), at 13, 17 (quoted above).  This Court's understanding of the Settlement Agreement (a matter within the purview of this court) is relevant and should be helpful to the Supreme Judicial Court's consideration of the certified questions regarding the meaning of the state law (a matter within the purview of the Supreme Judicial Court).  This Court should convey that understanding to the Supreme Judicial Court as part of the certification.  Since that determination would not entirely remove the controversy about the meaning of the state law, certification would still be appropriate.

### B.    An Unexpressed Intent Of The Parties To Mandate Transliteration, Even If Proven, Would Not Be Relevant

However, an unexpressed intention of the parties to the Settlement Agreement to mandate transliteration, even if proven (and none of the many affidavits that the United States has submitted actually attests that there was such an agreed-upon intention), would not be relevant to the Legislature's understanding or intent in enacting the special state law or to Supreme Judicial Court's consideration of the certified questions.

The so-called Motion to Clarify should be summarily denied because what it seeks actually is a modification of the Settlement Agreement and *not* a clarification.  To

the extent that the Motion to Clarify is based upon an asserted private agreement between the United States and the City, it should be summarily denied for the further reason that its allowance would conflict with the Court's objective to preclude private agreements not apparent to the public.  Transcript of Hearing at 29-30.

If the Court does *not* summarily deny the Motion to Clarify, it should at least defer its consideration.  Assuming that the United States produces some evidence of an unexpressed, private agreement between it and the City that the Settlement Agreement would mandate transliteration without saying so, the Motion should not be heard without affording the Secretary the opportunity to take discovery, and potentially an evidentiary hearing, on that point, which predictably could require substantial time and resources of the Court and the parties.  Moreover, even if the United States were, in this process, to satisfy the Court that such an unexpressed agreement had been reached in the formation of the Settlement Agreement, that would neither change the objective meaning of the Settlement Agreement, nor would it be relevant to the determination of the Massachusetts legislature's understanding and intent in enacting the special state law.  The meaning of the special state law is key here because it binds the Secretary, one way or the other, but the unstated intent of the parties to the Settlement Agreement is of no legal significance, or at least cannot resolve the present controversy.

>     **C.      Most Or All Of The Materials Submitted In Support Of The Motion**
>     **To Clarify Should Be Limited, Excluded Or Stricken**

Less than 48 hours before last week's hearing, the United States filed a Response to the Secretary's Opposition to the United States' Motion to Clarify to which it attached several dozen declarations or other exhibits.  These voluminous filings, which were made

without the leave of court that Local Rule 7.1(B)(3) requires, should be stricken, limited or otherwise excluded from this Court's consideration of the pending motions as well as from any certification of questions of state law to the Supreme Judicial Court. With limited possible exceptions, they are not relevant either to the legislative intent in the special state law, or even to the objective meaning of the Settlement Agreement (or are otherwise inadmissible).

Similarly, less than 24 hours before last week's hearing, the Chinese Progressive Association and others filed their Motion for Leave of Court to File a Brief Amicus Curiae, along with their proposed amicus brief and numerous additional declarations and exhibits. Although the Court granted that motion at the commencement of the hearing, the Secretary respectfully submits that these affidavits and exhibits should be stricken, limited or otherwise excluded from this Court's consideration of the pending motions as well as from any certification of questions of state law to the Supreme Judicial Court. With limited possible exceptions, they are not relevant either to the legislative intent in the special state law, or even to the objective meaning of the Settlement Agreement (or are otherwise inadmissible). Moreover, the submission of evidence goes beyond the proper role of amicus curiae.

The Secretary has not yet concluded whether it will be necessary for him to file a motion to strike, limit or exclude these materials. It appears quite possible that these issues will naturally be sorted out in a more informal process of preparing the statement of facts that the Supreme Judicial Court requires to accompany the certification of questions of state law; the facts relevant to any such certification should be narrow and limited. On the other hand, if these materials may be included in the certification, or if

this Court will rely upon them in considering the Motion to Clarify, it may be necessary for the Secretary to move to strike, limit or exclude most or all of them, and/or to conduct discovery into the allegations that they make.[6]  The Secretary is hopeful that this cumbersome and potentially time-consuming process will not be necessary. However, if the Court plans to establish a schedule for either of these motions that contemplates consideration of these materials, the Secretary respectfully requests that the Court provide a window for the Secretary to bring such a motion and, potentially, to conduct discovery and make opposing evidentiary submissions as appropriate.

## III.    THE MOTION TO CERTIFY SHOULD BE DETERMINED BY THE SINGLE DISTRICT JUDGE TO WHOM THE CASE WAS ASSIGNED

Count I of the Complaint in this case alleged that the City of Boston was subject to the requirements of § 203 of the Voting Rights Act, 42 U.S.C. § 1973aa-1a, but only with respect to the *Spanish* language.  Complaint, ¶ 11.  A municipality such as Boston becomes subject to the requirements of § 203 when the Director of the Census determines that more than 10,000 (or more than 5%) of its voting age citizens are members of a single language-minority group and have limited English proficiency.  42 U.S.C. § 1973aa-1a.  The Census Director publishes his determinations under § 203 following each decennial census; he last did so on July 26, 2002.  *See* 67 Fed. Reg. 48,871 (July 26, 2002).  Significantly for the present case, the Census Director did <u>not</u> find that, among the City's 388,570 voting age citizens, more than 10,000 (or more than 5%) were Chinese-American voting age citizens of limited English proficiency; accordingly,

---

[6] In response to the Court's request, the parties have made plans to meet and confer about the allegations of poll worker misconduct made in some of those declarations and possible corrective or preventative action.

Boston is <u>not</u> subject to the requirements of § 203 with respect to the Chinese language.[7]
Count I of the Complaint alleged that the City was in violation of § 203 only in failing to
translate all election materials into Spanish and failing to supply and train an adequate
pool of Spanish-speaking poll workers.  Complaint, ¶¶ 15-17.  It is that claim under § 203
with respect to Hispanic voters that required the convening of the three-judge district
court, as 42 U.S.C. § 1973aa-2 and 28 U.S.C. § 2284 provide.  *See* Complaint, ¶ 2.

Count II of the Complaint asserted, by contrast, that the City violated § 2 of the
Voting Rights Act, 42 U.S.C. § 1973, on the basis of alleged disrespectful behavior and
misconduct by certain city poll workers with respect to certain unidentified, limited
English proficient Chinese, Vietnamese, and Hispanic voters.  Complaint, ¶¶ 20-22.  This
claim did *not* require a three-judge district court.[8]

Finally, the Secretary's Counterclaim and Cross-Claim seeks declarations as to
the meaning of state law, which obviously do not require a three-judge federal court.

When a claim that must be heard and determined by a three-judge district court is
combined a claim for which a three-judge court is not required, one line of cases holds
that the three-judge court should hear and determine both claims if they are "inextricably

---

[7] In fact, according to the allegations of the Complaint, ¶ 10, there are only 9,825 Chinese
voting age citizens within the City, among whom 50.1% are limited English proficient; if
those figures are correct (and they may be overstated, *see* Answer, ¶ 10), the number of
limited English proficient Chinese voting age citizens in the City is 4,922 (representing
about 1.3% of the City's voting age citizens), or less than half of the numerical threshold
(and about one-quarter of the percentage threshold) for coverage under § 203.

[8] Despite a reference by counsel for the United States at the hearing on July 25, 2007, the
Complaint contains no allegations of any constitutional violations.  Nor does it contain
any allegation of intentional racial discrimination on the part of any of the defendants;
intentional discrimination is an essential element of a constitutional claim. *See Reno v.
Bossier Parish School Board,* 520 U.S. 471, 481-82 (1997); *Rogers v. Lodge*, 458 U.S.
613, 617-18 (1982)**.**

intertwined," *see Page v. Bartels,* 248 F.3d 175, 190 (3rd Cir. 2001) (where the court ruled that a constitutional challenge and a Voting Rights Act challenge to the same statewide reapportionment should both be heard by the three-judge court). But other cases, such as *Morse v. Oliver North for U.S. Senate Committee, Inc.,* 853 F. Supp. 212, 215 (W.D. Va. 1994), *rev'd on other grounds,* 517 U.S. 186 (1996), have held that a three-judge court lacks the authority to exercise jurisdiction over any claim in the case that was not specifically required to be heard and determined by a three-judge court.

At the very least, it appears clear that a three-judge court that disposes of the claim that required the three-judge court to be convened has the *discretion* to remand the other claims to the single district judge to whom the case initially was assigned (at least if the two claims are not "inextricably intertwined"). *See, e.g., Robertson v. Bartels,* 148 F. Supp.2d 443, 459-62 (D.N.J. 2001), *aff'd mem.,* 534 U.S. 1110 (2002), where the three-judge court, after disposing of a constitutional challenge to a statewide reapportionment plan, held that a count challenging a candidate residency requirement constituted a separate and distinct claim that should be heard by the single district judge, and remanded that claim to the single judge accordingly. *See also Adams v. Clinton,* 40 F. Supp. 2d 1 (D.D.C. 1999) (holding that even if the three-judge court had ancillary jurisdiction over the non-three-judge court claim, that authority was discretionary).[9]

---

[9] *Frew v. Hawkins,* 540 U.S. 431 (2004), concerned the authority of the federal court to enforce a consent decree, but did not directly address the jurisdictional scope of a three-judge federal court to decide ancillary issues. It should be emphasized that in this case, unlike *Frew,* there has been no finding or admission of liability, and also that the last sentence of ¶ 2 of the Settlement Agreement, should it ever be necessary to reach it, certainly does not bind the Secretary, who was neither a party to the Settlement Agreement nor, at the time, to the case.

In this case, the three-judge court was properly convened and, having considered the Settlement Agreement that the parties submitted to it to resolve both causes of action, it properly may and should make findings, consistent with the statements at last week's hearing, that it did not understand the Settlement Agreement to mandate transliteration. However, it is also the case that the question of transliterating candidates' names into Chinese characters is separate and distinct from the only claim in the complaint that required the convening of the three-judge court.

The Secretary submits that the present controversy implicates claims over which the federal jurisdiction properly rests, not with the three-judge court, but with the single district judge initially assigned to this matter. In particular, the Secretary's claims for declaratory relief as to whether or not the special state law mandates transliteration of the candidates' names into Chinese characters are separate and distinct from the claim in the first cause of action in the complaint that the City had not complied with the specific requirements of § 203 with respect to Hispanic voters. Accordingly, the Secretary

submits that his Motion to Certify Questions of Law to the Supreme Judicial Court

should be heard and decided by the single district judge.

Respectfully submitted,

SECRETARY OF THE
COMMONWEALTH OF
MASSACHUSETTS
By his attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

 /s/ H. Reed Witherby_____
H. Reed Witherby, BBO #531600
Special Assistant Attorney General
Smith & Duggan LLP
Two Center Plaza
Boston, MA 02108
(617) 228-4400
rwitherby@smithduggan.com

Peter Sacks, BBO No. 548548
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108-1698
(617) 727-2200, ext. 2064
Peter.Sacks@state.ma.us

August 1, 2007

Certificate of Service

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and
thus copies will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF); paper copies will be sent this day to those who are indicated on the NEF as
non-registered participants and who are not represented by counsel.
                                                                                    /s/ H. Reed Witherby